[Civ. No. 27678.   Second Dist., Div. One.   Mar. 23, 1964.]

BRUNZELL CONSTRUCTION COMPANY, INC., Plaintiff and Appellant, v. HARRAH'S CLUB, Defendant and Respondent.

Leon J. Garrie for Plaintiff and Appellant.

Burton & Marshall, Adrian Marshall, Pacht, Ross, Warne, Bernhard & Sears and Harvey M. Grossman for Defendant and Respondent.

FOURT, J.—This is an appeal from an order which grants the motion of Harrah's Club to quash and set aside the service of summons and complaint.

The complaint filed on June 11, 1962, sets forth among other things that plaintiff (hereinafter sometimes referred to as Brunzell), a Nevada corporation, on January 9, 1962, made a written contract with Harrah's Club, a corporation, for the construction of a casino building in Reno, Nevada. Several other defendants are joined in the action, among such being William C. Wagner, Robert Raimist, William Harrah, Dames & Moore, a partnership, Vernon A. Smoot, Trent R. Dames, William W. Moore, William W. Brewer, Jr., Le Roy Crandall, John A. Martin, Harrah's South Shore Corporation, a corporation, and Glen Falls Insurance Company, a corporation.

It is stated in the complaint (and admitted in the answer to interrogatories by William F. Harrah) that William Harrah is the sole stockholder of both Harrah's Club, a Nevada corporation, and Harrah's South Shore Corporation, a Cali-

fornia corporation, and that the officers and directors of the two corporations are identical.

The first cause of action is for fraud and misrepresentation against all of the defendants with the exception of Glen Falls Insurance Company. There are set out certain misrepresentations appearing in the contract documents which were prepared in Los Angeles. The second cause of action is against Harrah's Club, William Harrah, Harrah's South Shore Corporation, and some fictitious defendants and therein it is alleged that there was a breach of contract evidenced by the same documents referred to in the first cause of action. The third cause of action is against William C. Wagner, the architect, Robert Raimist, the architect's employee, Dames & Moore, a partnership, Vernon A. Smoot, Trent R. Dames, William W. Moore, William W. Brewer, Jr., Le Roy Crandall, soils engineers, John A. Martin, structural engineer, and various fictitious defendants. It is therein alleged that the said defendants negligently created and prepared the contract documents including the plans and specifications and that plaintiff was damaged as a proximate result of such negligence. It is alleged that the ''contract documents are defective, unfit, inaccurate, incomplete, self-contradictory and unsuitable for the purpose for which they were intended. ...'' The fourth cause of action is against the architect defendants and certain fictitious defendants for tortiously interfering with the contract between plaintiff and Harrah's Club. The fifth cause of action is against Harrah's Club, William Harrah, Harrah's South Shore Corporation and certain fictitious defendants. It is therein alleged that said defendants refused to make payments for stockpiled materials all to the end that plaintiff would thereby be weakened and by economic compulsion be forced to abandon the casino contract. The sixth cause of action is against all defendants with the exception of Glen Falls Insurance Company and therein it is alleged among other things that there was a breach of an express warranty with reference to the sufficiency of the contract documents. The seventh cause of action is against Harrah's Club, William Harrah, Harrah's South Shore Corporation, Glen Falls Insurance Company, and certain fictitious defendants and seeks among other things a determination of the liability of plaintiff and the named defendants with reference to a surety bond issued to Harrah's Club with Glen Falls Insurance Company as the surety.

It is further alleged that Dames, Moore, Brewer, Crandall, Smoot, Martin, Raimist and Wagner are residents of Los

Angeles County. Harrah's South Shore Corporation has admitted that it is a California corporation, and Wagner, Dames, Smoot and (in effect) John Martin admit that they are residents of Los Angeles County.

A copy of the summons and of the complaint were served upon defendant Harrah's Club by serving the California Secretary of State pursuant to a court order. Harrah's Club has appeared specially and contends that the court "lacks personal jurisdiction over defendant, Harrah's Club. . . ."

The matter was presented to the court by affidavits and declarations of various officers of the corporations and individuals.

There should be little question about the facts in the matter as extensive discovery proceedings were had and voluminous interrogatories and answers thereto are in the record. The great preponderance of the facts supporting the appellant's affidavits, declarations and contentions with reference to whether Harrah's Club is doing business in this state is taken from the records produced by Harrah's Club, or the answers by Harrah's Club officers or employees to interrogatories of the plaintiff. In other words there is no material question of fact in this case but there is a question as to the legal consequences which necessarily flow from the activities or facts.

A résumé of some of the pertinent facts is as follows: The contract was in fact signed in Reno, Nevada, January 9, 1962, and provided for the construction of a multimillion-dollar casino building in that city, within which casino Harrah's Club presumably would operate its gambling activities, bar, recreation, entertainment, restaurant and other activities. The contract documents were prepared in Los Angeles by the architects, Wagner and Raimist, and others, who are residents of Los Angeles County, for example, by the soil engineers, Dames & Moore, the structural engineer, Martin, and others.

Harrah's Club maintains offices in San Francisco and is listed in the telephone directory of that city as follows:

Harrah's

```
Tahoe Show Reservations 1024 Stktn ......SU 1-2771
TWA Flight Information 1024 Stktn ......SU 1-2771
Reno Bus Information 1024 Stktn ........SU 1-6911
Tahoe Bus Information —
    Greyhound Bus Lines ................DO 2-4664
```

Employment Office 417 Mkt ...............EX 7-6862
Harrah's Club Information 7th near Mkt...HE 1-13621
HARRAH'S RESERVATION CENTER .............SU 1-2771

Harrah's Club controls through Harrah's South Shore Corporation an employment office in San Francisco and designates the office by a painted sign on the door which is in the same design and form as appears on Harrah's Club letterheads and forms, with the wording, ''Harrah's Club—Reno and Lake Tahoe, Employment Office, Enter.'' Photographs of the office door above mentioned are in the file and clearly depict that the office in question is an office of Harrah's Club and that it is an employment office. There is no telephone listing for Harrah's South Shore Corporation in San Francisco.

The records of Harrah's Club supplied by Mr. MacMichael, Harrah's Club personnel supervisor at Harrah's Club personnel office, Stateline, Nevada, on January 29 and 30, 1963, show that in the year 1961, 13,902 employment applications were processed by Harrah's Club San Francisco office and 524 applicants were hired by Harrah's Club, many of them being hired in San Francisco. It is interesting to note that Harrah's Club correspondence and records disclose many summer placements in categories such as change girls, cocktail waitresses, crap dealers, keno runners and writers, 21 dealers, et al., and that the placement offices of at least six colleges or universities in the San Francisco district are contacted for personnel to fill such jobs. Correspondence from John Smolley, an employee of Harrah's South Shore Corporation, the employment agent of Harrah's Club in San Francisco, is sent directly to Frank Raye, Harrah's Club employment supervisor in Reno, on stationery reading ''Harrah's Club—Reno and Lake Tahoe.'' Smolley's interoffice correspondence in effect refers to the San Francisco employment office as Harrah's Club San Francisco employment office, and Smolley with respect to answering inquiries as to whether the Harrah's Club office in San Francisco is an employment office for the Reno and Tahoe operations has indicated that it is such an employment office.

The Harrah's South Shore Corporation or the Harrah's Club office in San Francisco was in operation in June of 1962 when this action was commenced. A monthly report of Smolley (July 1, 1962) indicates that 1,069 applicants were interviewed in June 1962 (something less than the year before). It is noted from Smolley's correspondence with the office in

Reno that he thought there was no cause for alarm because "the quality of hires improved this year, since we are dealing almost exclusively with college students ... a secondary benefit was the reduced cost of advertising."

The records of Harrah's Club disclose that Smolley through Harrah's South Shore Corporation hires employees for Harrah's Club in San Francisco. The application form which the employment prospect fills out indicates that the application is being made to go to work for Harrah's Club. The application for a fidelity bond by the prospective employee sets forth that the applicant will work for Harrah's Club. The interview rating form is clearly on Harrah's Club stationery with the name imprinted thereon. There is nothing on the documents indicating that the applicant is dealing with Harrah's South Shore Corporation. Harrah's Club, either directly or through its agents, as a continuous and substantial part of its business for over two years operated the employment office in San Francisco and processed on the average approximately 1,000 employment applications per month for Harrah's Club. Harrah's Club advertisements in San Francisco for employees for Harrah's Club run from $35,000 to $75,000 a year. Harrah's Club has an annual payroll in excess of $10,000,000.

Harrah's Club through its agent, Harrah's South Shore Corporation, contracts with Western Greyhound lines for the transportation of bus passengers from California to Nevada and return on special operations buses operated exclusively for patrons of Harrah's Club. Harrah's Club admits that the Harrah's South Shore Corporation employs a firm of certified public accountants in San Francisco to act as accountants for the bus operation and that this firm periodically audits and reviews the manifests and billings rendered by Greyhound. Harrah's South Shore Corporation guarantees Greyhound an average of 25 passengers per bus per day to go to Reno and Lake Tahoe and return.

Harrah's Club employs and has so employed for 18 months last past an advertising agency in San Francisco and that agency places advertisements for Harrah's Club in California. Harrah's Club employs five people in its advertising department, and correspondence between Harrah's Club's advertising department and the California agency amounts to several thousand pages a year and innumerable oral and telephone communications. Harrah's Club states that it does not solicit customers in California with respect to its gambling

activities but only for its bar and entertainment facilities (Presumably it is meant by the assertion that no person who reads or hears an advertisement of Harrah's Club in California is given the idea that he can gamble if he proceeds to Harrah's Club in Reno or Tahoe, and if he does ever get the idea of gambling it is an afterthought arrived at after the patron arrives at Harrah's Club or at least after he leaves California and arrives in Nevada). Our naïveté is not developed to the extent that we accept that statement as being wholly true and we do not intend to be blinded to reality.

Harrah's Club through its agent and the Harrah's South Shore Corporation maintains a reservation office in San Francisco where three employees are engaged in giving out information and making reservations for shows at Harrah's Club. The personnel of that office send the requests for show reservations direct to Harrah's Club by teletype and responses confirming or denying reservations are made direct from Harrah's Club to the reservation office in San Francisco.

Harrah's Club assigns for collection claims against residents of California for obligations other than gambling debts. Three agencies in California have such collections to make. Harrah's Club presently has over 3,000 accounts on assignment, several of which are in California. Harrah's Club as plaintiff has more than one action presently pending in the courts of California.

Harrah's Club leases and uses land in California in its business operations. There are many sign spaces in use and in addition thereto there is approximately a 1½-acre plot of land in El Dorado County, California, which is immediately adjoining Harrah's Club Lake Tahoe operation where free parking is provided for the customers of Harrah's Club. The lessor of this land is Harrah Realty Company, P.O. Box 10, in Reno, Nevada (the stock of which is solely owned by William F. Harrah, and the officers and directors are substantially the same as in the other named corporations). There is also maintained in El Dorado County an establishment called Naify House which is used to provide free housing for the entertainers who are engaged at Harrah's Club at Lake Tahoe. Harrah's Club pays the taxes assessed against the parking lot and personal property taxes levied against its signs.

Harrah's Club employees work in California caring for the Naify House which is used to provide free housing for Harrah's Club entertainers, and Harrah's Club employees assist

in parking the cars of Harrah's Club patrons on the 1½-acre parking lot in El Dorado County owned by Harrah Realty Company and leased to Harrah's Club.

The contract documents were prepared in Los Angeles County by the architects, the structural engineer and the soil engineers, all of whom are residents of Los Angeles County and doing business and with their offices located in Los Angeles County.

The records of Harrah's Club disclose that over 500 of its employees live in California. Harrah's South Shore Corporation admittedly is doing business in the State of California and admittedly Harrah's South Shore Corporation is the agent of Harrah's Club, and in effect and fact has no other business.

In short, Harrah's Club among other things operates by and through its employees an extensive parking lot in California in conjunction with the casino business, leases in California several parcels of land for sign spaces, operates and maintains with its employees a house for the housing of its entertainers, causes to be maintained an office in San Francisco designated as "Harrah's Club," maintains a listing in the San Francisco telephone directory, processes employment applications and hires employees in San Francisco, advertises at a cost of $35,000 to $75,000 per year for employees in San Francisco newspapers, contracts with the Greyhound Lines for transportation of bus passengers from California to Nevada and return on special operations buses operated exclusively for patrons of Harrah's Club, employs in California an advertising agency which places advertising in California, and assigns for collection to California collection agencies' claims against California residents. More than 500 of Harrah's Club employees live in California.

The contract documents (invitations to bid, instructions to builders, form of proposal, form of agreement, A.I.A. general conditions, report of foundation investigation, supplement to general conditions, special provisions and plans and specifications and addenda thereto) prepared in Los Angeles County contain provisions requiring that the construction work be performed in accordance with the safety orders of the Industrial Accident Commission of the State of California, further that bidders on the construction work be required by the contract documents to comply with sections 4100 to 4108 inclusive of the Government Code of the State of California. In short, Harrah's Club representatives in Los Ange-

les, in effect, wrote into the contract provisions that the laws of California shall govern the contract insofar as subcontractors and safety provisions are concerned.

Appellant contends that Harrah's Club is "doing business in this state" under the law of California. ■ The burden of showing that Harrah's Club is doing business in this state is upon the appellant.

Section 411 of the Code of Civil Procedure provides in part:

"The summons must be served by delivering a copy thereof as follows:

"1. . . . . . . . . . . . . . .

"2. *If the suit is against a foreign corporation* or a non-resident joint stock company or association, *doing business in this State*; in the manner provided by sections 6500 to 6504, inclusive, of the Corporations Code.

". . . . . . . . . . . . ."

In *Fielding* v. *Superior Court* (1952) 111 Cal.App.2d 490, 494 [244 P.2d 968], the court said: "The essential thing is merely whether the corporations are present within the state, whether they operate through an independent contract, agent, employee, or in any other manner." (Hearing denied and cited with approval in *Empire Steel Corp.* v. *Superior Court* (1961) 56 Cal.2d 823, 835 [17 Cal.Rptr. 150, 366 P.2d 502].)

In *Yeck Mfg. Corp.* v. *Superior Court* (1962) 202 Cal.App. 2d 645, 651 [21 Cal.Rptr. 51], the court set out a review of some of the California cases where jurisdiction has been assumed upon holding that the foreign corporation was "doing business" in this state, the court saying among other things: "Thus, in *Koninklijke L. M.* v. *Superior Court,* 107 Cal.App. 2d 495 [237 P.2d 297] the petitioner maintained offices with 24 employees in California to administer and supervise its purchase contracts and for other purposes; in *Iowa Mfg. Co.* v. *Superior Court,* 112 Cal.App.2d 503 [246 P.2d 681], petitioner had an authorized dealer residing in California selling and servicing its products; in *Jeter* v. *Austin Trailer Equipment Co.,* 122 Cal.App.2d 376 [263 P.2d 130], defendant maintained a personal representative in this state for solicitation of business and with authority to adjust complaints in addition to a warehouse stock a portion of the time; in *Sales Affiliates, Inc.* v. *Superior Court,* 96 Cal.App.2d 134 [214 P.2d 541], petitioner maintained a personal solicitor, licensed the use of its products and collected rental therefor in California; in *Thew Shovel*

*Co.* v. *Superior Court,* 35 Cal.App.2d 183 [95 P.2d 149], petitioner maintained exclusive sales distributors, sold on sales contract, title retained, and maintained price control, all in California; in *Emsco Pavement etc. Corp.* v. *City of Los Angeles,* 176 Cal.App.2d 760 [1 Cal.Rptr. 814], defendant Anders-Jahre and Company conducted, over a period of many years, a commercial shipping business in California waters with resident agents ashore; in *Florence Nightingale School of Nursing* v. *Superior Court,* 168 Cal.App.2d 74 [335 P.2d 240] petitioner maintained a large course of nursing instructions by mail with extended mutual correspondence during the course of instruction, correction of papers, solicitation through advertising in 25 magazines circulated in California; in *Thomas* v. *J. C. Penney Co.,* 186 Cal.App.2d 223 [8 Cal.Rptr. 721], defendant Fairy Tale Children's Wear, Inc., maintained solicitation through sales organizations in California, catalogs placed with outlets, price control, and a 'hold harmless' agreement with wholesalers; in *West Publishing Co.* v. *Superior Court,* 20 Cal.2d 720 [128 P.2d 777], petitioner maintained four salesmen on salary with exclusive district sales powers under detailed control of company as to price and credit arrangements covering the whole state of California; in *Henry R. Jahn & Son* v. *Superior Court,* 49 Cal.2d 855 [323 P.2d 437], petitioner regularly purchased in California grain driers manufactured in California, from a partnership doing business here, there being an alleged conspiracy between petitioner and partnership to take over plaintiffs' business in California; in *Cosper* v. *Smith & Wesson Arms Co., supra* [53 Cal.2d 77 (346 P.2d 409)], petitioner had a manufacturer's representative actively engaged in promoting sales on commission and operated extensively and regularly throughout California; in *Empire Steel Corp. of Texas, Inc.* v. *Superior Court, supra* [56 Cal.2d 823 (17 Cal. Rptr. 150, 366 P.2d 502)], the vice president owning 47.5 per cent of Empire stock lived and carried on business operations for petitioner in this state.''

█ The facts as outlined and the activities of Harrah's Club in this state are, to be true, as to the most part not directly connected to the claims of plaintiff in this action; however the law of this state is to the effect that ''a foreign corporation may have sufficient contacts with a state to justify an assumption of jurisdiction over it to enforce causes of action having no relation to activities in that state. ...'' *Koninklijke L. M.* v. *Superior Court* (1951) 107 Cal.App.2d 495, 501 [237 P.2d 297]. See also *Perkins* v. *Benguet Consol.*

*Mining Co.*, 342 U.S. 437, 445-447 [72 S.Ct. 413, 96 L.Ed. 485]; *International Shoe Co.* v. *Washington*, 326 U.S. 310, 318 [66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057]; *Fisher Governor Co.* v. *Superior Court*, 53 Cal.2d 222, 225 [1 Cal. Rptr. 1, 347 P.2d 1].

The causes of action in this case are all transitory. Four of the seven causes are based on a tort theory. In *Schultz* v. *Union Pac. R. R. Co.* (1953) 118 Cal.App.2d 169, 178 [257 P.2d 1003], it is said: ''[6] The general policy of the common-law courts is to entertain transitory tort actions regardless of the parties or the place where the cause of action arose, if the court in which the action is brought has jurisdiction over the parties and the subject-matter. [7] The rule is that if a cause of action is transitory the action may be brought in this state if the defendant is found here. ... [9] California courts exercise that jurisdiction in actions by citizens of other states, nonresidents of this state, for the trial of transitory causes of action, whether based on the common-law or a statute of a sister state or a statute of the United States. There is the limitation that the law of the sister state be not contrary to the express provisions of the law or the public policy of California, to abstract justice or pure morals, or injurious to the people.''

Respondent asserts that it is not required or proper to treat Harrah's South Shore Corporation's activities as those of Harrah's Club. As heretofore indicated the officers and the boards of directors of each company are identical and William F. Harrah owns all of the stock of each of the corporations. Each company is distinctly a one-man corporation. Under our law where one person owns all of the stock of a corporation and uses the corporation as a mere conduit for the transaction of his own business, the corporation is regarded as his ''*alter ego.*'' See *Wenban Estate, Inc.* v. *Hewlett*, 193 Cal. 675, 696-697 [227 P. 723]; *D. N. & E. Walter & Co.* v. *Zuckerman*, 214 Cal. 418, 420 [6 P.2d 251, 79 A.L.R. 329]; *Minifie* v. *Rowley*, 187 Cal. 481, 487 [202 P. 673]. To adhere to the separate corporate entity theory in this case would be nothing short of placing a judicial stamp of approval upon an apparent fraud—here the whole structure of the various enterprises is transparent. It is crystal clear that Harrah's South Shore Corporation is nothing but an *alter ego*, an alias, a branch, a business conduit or an instrumentality of Harrah's Club to do in California what Harrah's Club otherwise could not do.

There is nothing passive, intermittent or sporadic about Harrah's Club activities in California—both as to its immediate activities such as maintaining important parts of its business in California (parking lot, housing of entertainers, signs and advertising) and the activities of its *alter ego* Harrah's South Shore Corporation. We have no difficulty in determining that the two companies are but part of the vast holdings owned exclusively by William F. Harrah and we have no hesitancy in treating the companies as one; however under the circumstances as here related even if we did not do so there is still sufficient activity of Harrah's Club in California to make it amenable to California jurisdiction.

If a foreign corporation acting through its agent, a local corporation, intentionally through its agent conducts business in the forum as is done in this case then why should not the principal, the foreign corporation, be amenable to process the same as if it had been technically present? One court has said "There is a tendency now to cut through the maze of corporate appearances to arrive at the true status and relationship. The fiction of corporate entity is no longer controlling." *Pergament* v. *Frazer*, 93 F.Supp. 9; Volume 9 U.C.L.A. Law Review 249, 254 states: "To allow *International Shoe* its full impact, contacts with the forum should be evaluated for jurisdictional significance without a mechanical consideration of the mode of contract, whether through a subsidiary corporation, independent contractor or agent."

As counsel for appellant states in part: "Harrah's South Shore Corporation is nothing more than the suction mouth of a pipeline running directly from California to the gaming tables of Nevada. There is no divisibility. The entire organization of Harrah's Club and Harrah's South Shore Corporation is a single, integrated machine to bring California pilgrims with well filled pocketbooks to the obliging gaming tables run by William F. Harrah in Nevada. The same pipeline serves a dual purpose of feeding employees as well as money into the insatiable gambling halls."

There is without question a regular and continuous solicitation and numerous other business activities by Harrah's Club within California.

■ Every case must be decided upon the facts of that particular case. ■ Under the circumstances of this case we do not believe that any inconvenience to Harrah's Club is of any concern and "traditional notions of fair play and

substantial justice'' will not be offended by holding Harrah's Club amenable to jurisdiction in this case.

The order quashing, setting aside and vacating the service of summons and complaint is reversed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied April 8, 1964, and respondent's petition for a hearing by the Supreme Court was denied May 20, 1964.