[Civ. No. 24432. First Dist., Div. Four. Feb. 28, 1969.]

AGALITE-BRONSON COMPANY, Plaintiff and Appellant, v. K. G. LIMITED, Defendant and Respondent.

Breed, Robinson & Stewart, Howard H. Bell and Sheridan Downey III for Plaintiff and Appellant.

Thelen, Marrin, Johnson & Bridges and H. Roger McPike for Defendant and Respondent.

DEVINE, P. J.—Plaintiff corporation, herein called "Agalite," appeals from an order granting a motion to quash service of summons on K. G. Limited, herein called "K. G." The question is whether K. G., a Danish corporation, was doing

business in California, thus making it subject to process under section 411, subdivision 2 of the Code of Civil Procedure.

The complaint on which the summons was issued contains allegations under nine counts against K. G. and M. L. Burke Company, a California corporation (which, having acted throughout by its president, M. L. Burke, is referred to herein simply as "Burke"). The counts are upon various alleged warranties, express or implied, on fraud connected with the warranties, and on negligent manufacture of a product.

The motion to dismiss was heard upon a mass of evidence: declarations under penalty, voluminous correspondence, a diary and nine depositions. The depositions were not actually put into evidence (it seems, from remarks of counsel, out of mercy for the trial judge) and are not before us; but each counsel makes reference in the briefs, without objection from his adversary, to parts of the depositions. The motion was granted without any memorandum, and although the judge made certain comments as the hearing progressed, which are referred to in the briefs, they are not very significant at this point, because, the comments having been made during the flow of argument, we cannot be sure what were the final views of the judge, except his single dispository conclusion. The rules of proof which guide us are:

1. The burden of showing that a corporate defendant is doing business in this state lies on the plaintiff. (*Brown* v. *Birchfield Boiler, Inc.*, 226 Cal.App.2d 487 [38 Cal.Rptr. 92]; *Brunzell Constr. Co.* v. *Harrah's Club*, 225 Cal.App.2d 734, 742 [37 Cal.Rptr. 659]; *Yeck Mfg. Corp.* v. *Superior Court*, 202 Cal.App.2d 645, 649 [21 Cal.Rptr. 51]; *Holtkamp* v. *States Marine Corp.*, 165 Cal.App.2d 131, 137 [331 P.2d 679].)

2. The question before the appellate court is one of law in so far as the facts are not in dispute. (*Cosper* v. *Smith & Wesson Arms Co.*, 53 Cal.2d 77, 81 [346 P.2d 409]; *Long* v. *Mishicot Modern Dairy, Inc.*, 252 Cal.App.2d 425, 427-428 [60 Cal.Rptr. 432]; *H. Liebes & Co.* v. *Erica Shoes, Inc.*, 237 Cal.App.2d 25, 30-31 [46 Cal.Rptr. 470]; *Sims* v. *National Engineering Co.*, 221 Cal.App.2d 511, 513 [34 Cal.Rptr. 537]; *Emsco Pavement etc. Corp.* v. *City of Los Angeles*, 176 Cal. App.2d 760, 766 [1 Cal.Rptr. 814].)

3. To the extent that the trial court has adjudged disputed factual contentions, the appellate court is bound by its implied findings in favor of the prevailing party. (*Griffith*

*Co.* v. *San Diego College for Women,* 45 Cal.2d 501, 507-508 [289 P.2d 476, 47 A.L.R.2d 1349].)

K. G. is not formally qualified to do business in California. It does not have employees, inventory, bank accounts, or offices here. The activities in this state which appellant relies upon to establish the doing of business are narrated below with our comments about them as they are given in sequence, so that repetition of facts may be minimized.

K. G. manufactures, among other products, a plant for the tempering of shock-resistant glass of the kind used in patio and shower-stall doors. Agalite, being interested in such a plant, came into contact with Burke, who told Agalite's president, Casebolt, that Burke was the exclusive representative in the United States for K. G. and that Casebolt must deal with him. Thus, Agalite had to deal with Burke in California. Burke's statement is supported by evidence. Harald Stenfeldt Hansen, subdirector of K. G., conceded that there was an agreement whereby K. G. would not sell a plant to anybody in the United States but Burke. Moreover, Burke had advertised, with K. G.'s authorization. An advertisement in Glass Digest, a nationwide trade publication, says: "The M. L. BURKE COM-PANY is the exclusive U. S. representative for K. G. Ltd., of Denmark, world leaders in the manufacturing of glass tempering plants." Copy of this had been supplied to K. G. The advertisement says, further: "Our fully trained engineering department supervises the complete design and installation of K. G. plants and fully trains your personnel in all phases of the tempering operation." Thus, it was made known to the public in California and elsewhere that Burke, exclusive representative of K. G., would take an active part in commencing the operation of any plant sold. It is not contended by Agalite that its contact with Burke was brought about by the advertisement. But the publication is evidence that Burke was recognized as K. G.'s exclusive representative, as Burke told Casebolt he was, and it is also evidence of activity in California, to the extent that the advertising was circulated in this state.

In April 1964, K. G. delivered to Burke an agreement stating that the Burke Company was appointed representative for K. G. tempering plants, authorizing Burke to advertise the plants, and agreeing to refer all inquiries about them to Burke. In August 1964, the agreement was extended to July 1968.

In 1962, K. G. and Burke made an agreement whereby

Burke would purchase a tempering plant. K. G. set forth particular warranties in the contract and agreed to send an English-speaking specialist to help. In March 1964, this contract was assigned by Burke to Agalite. The agreement between Burke and Agalite provided that Burke would supply his "know-how" in the installation of the plant and would supply the services (to be paid for by Agalite) of a Danish expert, as K. G. had agreed with Burke to do. K. G. gave the name of an expert, Riisberg, who had formerly worked for K. G. The agreement between Agalite and Burke bound the former "to show the tempering machine while it is in operation to prospective customers of K. G. Limited of Denmark."

Casebolt and Burke went to Copenhagen and observed testing of the plant. Arrangements were made for shipping. The K. G. contract with Burke describes delivery as "f. o. b. Copenhagen." The price from K. G. to Burke was $32,800; that from Burke to Agalite, $82,800.

Despite the mass of evidence which has been presented, it is not clear whether the sale at Copenhagen must be regarded as one from K. G. to Burke, or K. G. to Agalite, or K. G. to both. K. G. in later correspondence refers to the sale as for Burke's account; but K. G. directly invoiced Agalite for the whole of the balance due, referring to "Your order of April 4th by Mr. M. Burke/M. L. Burke Comp. of Union City, Calif. U.S.A." No doubt this subject will be a relevant one at trial, as will the subject of what warranties were given, and to whom: to Burke, to Agalite, or to both.

But the complete resolution of whatever problems these matters present is not for us now; it is sufficient for us to see what contacts with California appear. Although it seems that title passed from K. G. at Copenhagen, there was a certain residuary interest following the plant into this state. The invoice refers to insurance which Agalite was to pay for in favor of K. G., during the shipping. It was further agreed that a letter of credit in amount $10,000, the balance of K. G.'s purchase price, would be opened with a bank in San Francisco. The letter of credit was to be cashed by K. G. when "[n]otice that the plant is operating and can produce tempering glass according to American Tempering Association's specification for warpage, bow, etc." was signed by Riisberg or by Burke or by Hansen.[1] This required work and testing

---

[1]The condition referred to in the notice corresponds with one of the main warranties in the original K.G.-Burke contract.

which could be done *only in California* before certification
and final payment.

This brings us to Riisberg. He was an employee of Burke
for the purpose of assisting in the commencement of the oper-
ation of the plant in Oakland. But Burke in turn was K. G.'s
representative for sales. The work which Riisberg would do in
California would, if successful, be helpful to K. G., not only
in making possible the final payment on this particular sale,
but also in providing a showpiece for prospective customers.
Even before the assignment of the Burke contract to Agalite,
K. G. had written: "We are quite aware of the fact that
further orders might result as soon as the actual Plant is
installed." The delegation by K. G. to Riisberg to certify the
operational competency of the plant is also to be considered.
It is to be noted that he kept reporting to K. G. during his
stay in Oakland, and receiving advice from K. G. Whether
Riisberg was an agent of K. G. in the full sense of the word,
it is not necessary to decide at this point. He was an instru-
ment for certain purposes of K. G. in California, and was,
therefore, one of the "contacts" of the corporation with this
state.

Riisberg did not certify the plant to be satisfactory. Har-
ald Hansen did so, from Copenhagen, representing to the
bank in San Francisco that the plant is operating and can
produce glass according to American Tempering Association's
standards; and the payment on the letter of credit was made
to K. G. Indeed, Riisberg had grave misgivings, and had
noted in his diary that he agreed with Casebolt that the lay-
out did not work; that they had tried everything and had
achieved nothing; that he had promised he would ask Harald
Stenfeldt Hansen to come right away.

We come now to the visit of K. G.'s Harald Stenfeldt Han-
sen to California. This subject may be considered under two
aspects: 1) whether "trickery" was used by Agalite and,
perhaps, by Burke, too, to bring Hansen into this state, and,
if so, what effect this would have on the case; and 2) what
activities Hansen did engage in while he was here.

About a week after Mr. Hansen arrived in Oakland, the
present action was filed and summons was served on him. It
appears that the complaint was prepared before his arrival.
Respondent argues from these facts and from the fact that
Casebolt and  Burke had urged K. G. to send someone to
California to supervise the operation, that the requested
supervision was merely a pretext for inducing an officer of K.

G. to come here so that he might be served with process. The process, therefore, argues respondent (citing *Bowes* v. *Superior Court* (Cal.App.) 124 P.2d 667);[2] 42 Am.Jur., Process, §§ 35-37, pp. 32-34), was invalid. But even if this were so, it would not affect the complete service of process for there was a subsequent service on the Secretary of State of California, under order of court pursuant to section 6501 of the Corporations Code. The real question, therefore, is not whether service of summons was accomplished properly, but whether K. G. was doing business in this state, which would justify procedure under section 6501.

Respondent takes a second position on this subject, namely, that Hansen was beguiled into visiting California so that whatever activities he participated in would be used as evidence of doing business. Appellant declares that this point was not made before the trial judge, and we find, by examining the transcript of the argument and by reading the briefs which were presented to the judge, that this is so: the argument of subterfuge was made as to service of process only.

Anyway, the point would be of no avail. It is true that Burke and Casebolt exhorted K. G. to send an officer competent to rectify the defects with the plant. But it must be remembered that Burke was the representative of K. G. and that Harald Hansen testified, at his deposition, that even after he had come here, if someone had inquired about the purchase of a tempering plant, Hansen would have referred him to Burke. Burke himself was in danger of being sued on the guaranties he had given to Agalite and, in fact, was sued in this same action which names K. G. a defendant. Even if we infer that the trial judge believed, though the point was not argued to him, that Burke and Casebolt induced Hansen to come to California in order to make a showing of "contacts," we should still have to find that Hansen *did* participate in the activities described herein. His presence was not of the mere passive kind which might be utilized for service of process. He undertook to rectify the defects with the Agalite plant. This is an element to be considered along with the others. (See *Longines-Wittnauer Watch Co.* v. *Barnes & Reinecke, Inc.*, 15 N.Y.2d 443 [261 N.Y.S.2d 8, 209 N.E.2d 68]; 20 A.L.R.3d 1254.) Hansen said, in a declaration, that the defects were caused by Agalite but that he had made the

---

[2] In the *Bowes* case, hearing was granted by the Supreme Court and the cause was subsequently dismissed. The case, therefore, is no authority at all. (*Ponce* v. *Marr*, 47 Cal.2d 159 [301 P.2d 837].)

corrections, with the result that the plant operated in an entirely satisfactory manner. He personally delivered certain parts for the use of the plant in Oakland and invoiced Agalite therefor. He was present while demonstrations of the Agalite plant were made by Burke to prospective customers. He visited the plant of Armour Glass Company in Los Angeles, the owners of which were considered by Burke to be prospects.

Summing up the activities of K. G. within this state, we find the following:

1. Burke, a Californian, was K. G.'s exclusive representative. Many letters, which are exhibits, were sent by Burke to K. G., describing prospects for sales in this state. It is true that although other sales than Agalite's were not made, this may have been because of the deficiencies with the Agalite plant which, it is shown from the beginning of the correspondence between Agalite and Burke, was intended to be a showpiece. When we consider that the plant was high-priced and evidently an intricate one, and that not more than 47 of such plants had been sold throughout the world, we conclude that under the circumstances K. G. got the same advantages as it would have had by the use of a salesman within the state. (*Eclipse Fuel etc. Co.* v. *Superior Court,* 148 Cal.App.2d 736 [307 P.2d 739].)

2. Although title seems to have passed in Copenhagen, it was contemplated by the parties that the successful operation of the plant would be accomplished in California before final payment would be made. Riisberg, who had close contacts with K. G., was sent originally in this connection and Harald Hansen, the very inventor of the device, came later.

3. K. G. continually evinced interest in future sales in California and understood that these were related to the Agalite operation. Considering all of the circumstances, we find a doing of business although but a single completed sale is involved. (See *McGee* v. *International Life Ins. Co.,* 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199].)

4. Whether the guaranties made by K. G. ran to Agalite or to Burke only, they gave rise to litigation between Agalite and Burke. Agalite's complaint against Burke was followed by a cross-complaint by Burke against Agalite, in which Burke complains that Agalite has breached its agreement by refusing Burke to show the tempering machine while it is in operation to prospective customers of K. G., causing a loss of prospective sales.

It has been held that an important element in deciding

products liability cases is that of the foreseeability of the events which give rise to the lawsuit. (*Waco-Porter Corp.* v. *Superior Court,* 211 Cal.App.2d 559, 566 [27 Cal.Rptr. 371]; *Buckeye Boiler Co.* v. *Superior Court\** (Cal.App.) 74 Cal.Rptr. 580.) In this case of a sale, a lawsuit ought to have been quite foreseeable to the seller; that is, that a failure of the plant, which required specialized supervision abroad for the commencement of its operation, might produce litigation in the place where any failure would occur. This could only be in California. Whether warranties ran to Burke, to Agalite or to both, they would be breached, if at all, in this state.

We conclude that K. G. was doing business in this state within the meaning of the principle that the essence of doing business is that the corporation is present within the state sufficiently to constitute it just and equitable that the corporation be amenable to process within the state. (*Long* v. *Mishicot Modern Dairy, Inc.,* 252 Cal.App.2d 425, 428 [60 Cal.Rptr. 432]; *Empire Steel Corp.* v. *Superior Court,* 56 Cal.2d 823, 829 [17 Cal.Rptr. 150, 366 P.2d 502]; *Fisher Governor Co.* v. *Superior Court,* 53 Cal.2d 222, 224 [1 Cal.Rptr. 1, 347 P.2d 1]; *Cosper* v. *Smith & Wesson Arms Co.,* 53 Cal.2d 77, 82 [346 P.2d 409]; *Carl F. W. Borgward, G.M.B.H.* v. *Superior Court,* 51 Cal.2d 72, 75 [330 P.2d 789]; *Henry R. Jahn & Son* v. *Superior Court,* 49 Cal.2d 855, 858 [323 P.2d 437].) Whatever limit the ''doing business'' requirement imposes is equivalent to that of the due process clause. (*Fisher Governor Co.* v. *Superior Court, supra; Henry R. Jahn & Son* v. *Superior Court, supra; Cosper* v. *Smith & Wesson Arms Co., supra.*)

■ There is a cognate principle to be considered, namely, whether a greater amount of justice is afforded to the parties by allowing suit in this state rather than requiring it elsewhere. (*International Shoe Co.* v. *Washington,* 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057].) We proceed to use the tests set forth in *Fisher Governor Co.* v. *Superior Court, supra,* at pages 225-226:

1. This state is interested in providing a forum for its resident, Agalite.

2. As to the availability of evidence, the plant itself is here, as are Casebolt and his employees, and Burke. It is impossible for us to say that a larger number of witnesses or a greater

---

\*A hearing was granted by the Supreme Court on March 19, 1969. The final opinion of that court is reported in 71 Cal.2d 933 [80 Cal.Rptr. 113, 458 P.2d 57].

quantum of evidence would have to be brought from Denmark.

3. As to ease of access to an alternative forum, there is, of course, no other choice but California or Denmark. Neither is convenient to both parties.

4. Because of the action by Agalite against Burke and Burke's action against Agalite, it appears that the better choice for avoiding multiplicity of suits is to require K. G., since it is determined that it is doing business in this state, to defend the action here. We are not impressed by respondent's argument that Agalite can gain satisfaction, if it is entitled to any, by a judgment against Burke alone, for Burke is solvent. One of two or more potential defendants, if sued alone, usually will put forth every effort at trial to shift responsibility to the absent one. Besides, there is the problem of determining the character of witnesses—whether they are to be deemed adverse or not.

5. The cause of action arose in large part by K. G.'s local activities directly and through Burke.

The order quashing service of summons is reversed.

Rattigan, J., and Christian, J., concurred.

A petition for a rehearing was denied March 28, 1969, and respondent's petition for a hearing by the Supreme Court was denied April 23, 1969.