UNITED STATES $v.$ GLAXO GROUP LTD. ET AL.

No. 71–666.  Argued November 9, 1972—Decided January 22, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, MARSHALL, and POWELL, JJ., joined. REHNQUIST, J., filed a dissenting opinion in which STEWART and BLACKMUN, JJ., joined, *post*, p. 64.

*Deputy Solicitor General Friedman* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Kauper, Acting Assistant Attorney General Comegys, Wm. Terry Bray, Howard E. Shapiro,* and *Richard H. Stern.*

*Henry P. Sailer* argued the cause for appellee Glaxo Group Ltd. With him on the brief was *Francis D. Thomas, Jr. Sigmund Timberg* argued the cause for appellee Imperial Chemical Industries, Ltd. With him on the brief were *Paul N. Kokulis* and *Lawrence A. Hymo.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The United States appeals pursuant to § 2 of the Expediting Act, as amended, 62 Stat. 989, 15 U. S. C. § 29, from portions of a decision by the United States District Court for the District of Columbia in a civil antitrust suit. We are asked to decide whether the Government may challenge the validity of patents involved in illegal restraints of trade, when the defendants do not rely upon the patents in defense of their conduct, and whether the District Court erred in refusing certain relief requested by the Government.

I

Appellees, Imperial Chemical Industries Ltd. (ICI) and Glaxo Group Ltd. (Glaxo), are British drug companies engaged in the manufacture and sale of griseofulvin. Griseofulvin is an antibiotic compound that may be cut with inert ingredients and adminis-

tered orally in the form of capsules or tablets to humans or animals for the treatment of external fungus infections. There is no substitute for dosage-form griseofulvin in combating certain infections. Griseofulvin itself is unpatented and unpatentable. ICI owns various patents on the dosage form of the drug.[1] Glaxo owns various patents on a method for manufacturing the drug in bulk form, as well as a patent on the finely ground, "microsize" dosage form of the drug.[2]

On April 26, 1960, ICI and Glaxo entered into a formal agreement pooling their griseofulvin patents. At the time of the execution of the agreement, ICI held patents on the dosage form of the drug, and Glaxo held bulk-form manufacturing patents. Pursuant to the agreement, ICI acquired the right to manufacture bulk-form griseofulvin under Glaxo's patents, to sell bulk-form griseofulvin, and to sublicense under Glaxo's patents. Glaxo was authorized to manufacture dosage-form griseofulvin and to sublicense under ICI's patents. As part of the agreement, ICI undertook "not to sell and to use its best endeavors to prevent its subsidiaries and associates from selling any griseofulvin in bulk to any independent third party without Glaxo's express consent in writing."

Subsequent to the pooling of the griseofulvin patents, ICI granted a sublicense to American Home Products

---

[1] Specifically at issue in the present litigation is U. S. Patent No. 2,900,304, issued August 18, 1959. The patent embodies two types of claims—(1) a method of curing humans or animals of external fungus diseases by administering "an effective amount of griseofulvin" to them internally and (2) a capsule, tablet, or pill containing an effective amount of griseofulvin.

[2] Specifically at issue in the present litigation is U. S. Patent No. 3,330,727, issued July 11, 1967. This patent covers the improved (finely ground or "microsize") dosage form of griseofulvin. This form has proved more effective and more marketable than other dosage forms of the drug.

Corp. (AMHO), ICI's exclusive distributor in the United States. ICI agreed to sell bulk-form griseofulvin to AMHO. AMHO was authorized to process the bulk form into dosage form and to sell the drug in that form. With respect to bulk sales the agreement stated: "You [AMHO] will not, without first obtaining our [ICI's] consent, resell, or redeliver in bulk supplies of griseofulvin." Glaxo had previously entered into similar sublicensing agreements with two United States companies— Schering Corp. (Schering) and Johnson & Johnson (J & J). The agreements contained a covenant on the part of the licensees "not to sell or to permit its Affiliates to sell any griseofulvin in bulk to any independent third party without Glaxo's express consent in writing." [3]

On March 4, 1968, the United States filed a civil antitrust suit against ICI and Glaxo, pursuant to § 4 of the Sherman Act, 15 U. S. C. § 4, to restrain alleged violations of § 1 of the Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. The Government charged that the restrictions on the sale and resale of bulk-form griseofulvin, contained in the 1960 ICI-Glaxo agreement and the various sublicensing agreements, were unreasonable restraints of trade. The Government also challenged the validity of ICI's dosage-form patent.[4]

---

[3] Although AMHO, Schering, and J & J could have manufactured bulk-form griseofulvin under Glaxo's patents, in practice they purchased the bulk form of the drug from ICI and Glaxo and themselves performed the processes to convert the drug to dosage form.

[4] See, *supra*, n. 1. The Government contended that the "method" portion of the patent did not disclose how to practice the invention in that it failed to specify what is an "effective amount" of the drug. See 35 U. S. C. § 112. The Government also argued that ICI's product claims were invalid because the dosage form that they covered did not specify an "effective amount" of the drug, did not specify the diseases that could be cured, and claimed a patent monopoly over a substance long in the public domain. See 35 U. S. C. §§ 100 and 101.

The District Court, citing this Court's decision in *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365 (1967), held that the bulk-sales restrictions contained in the ICI-AMHO agreement were *per se* violations of § 1 of the Sherman Act.[5]   302 F. Supp. 1 (DC 1969).   Because ICI had filed an affidavit disclaiming any desire to rely on its patent in defense of the antitrust claims, the District Court struck the claims of patent invalidity from the Government's complaint, ruling that the Government could not challenge ICI's patent when it was not relied upon as a defense to the antitrust claims.   The District Court also denied the Government's motion to amend its complaint to allege the invalidity of Glaxo's patent on "microsize" griseofulvin.[6]

Subsequently, in separate, unreported orders, the bulk-sales restrictions in the Glaxo-J & J, the Glaxo-Schering, and the Glaxo-ICI agreements were found to be *per se* violations of § 1.   The court enjoined future use of the bulk-sales restrictions, but refused the Government's request to order mandatory, nondiscriminatory sales of the bulk form of the drug and reasonable-royalty licensing of the ICI and Glaxo patents as part of the relief.   328 F. Supp. 709 (DC 1971).   The United States took a direct appeal under the Expediting Act and we noted probable jurisdiction.   405 U. S. 914.

---

[5] The case was decided on the basis of various motions concerning the merits and the relief.   Testimony was not received; the facts were developed in affidavits, exhibits, and interrogatories accompanying the motions.

[6] See n. 2.   The Government had sought to challenge the patent on the basis that the patent purported to monopolize a product long in the public domain, on the basis of prior disclosure, and on the basis of prior public use.   See 35 U. S. C. §§ 100, 101, 102 (a), 102 (b).

## II

The major issue before us is whether the District Court erred in ruling that the United States could challenge the validity of a patent in the course of prosecuting an antitrust action only when the patent is relied on as a defense, which was not the case here. We agree with the United States that this was an unduly narrow view of the controlling cases.

*United States* v. *Bell Telephone Co.*, 167 U. S. 224 (1897), acknowledged prior decisions permitting the United States to sue to set aside a patent for fraud or deceit associated with its issuance, but held that the federal courts should not entertain suits by the Government "to set aside a patent for an invention on the mere ground of error of judgment on the part of the patent officials," at least where the United States "has no proprietary or pecuniary [interest] in the setting aside of the patent [and] is not seeking to discharge its obligations to the public . . . ." 167 U. S., at 269, 265. Subsequently, *United States* v. *United States Gypsum Co.*, 333 U. S. 364 (1948), referred to *Bell Telephone* as holding that the United States was "without standing to bring a suit in equity to cancel a patent on the ground of invalidity," *id.*, at 387, but went on to declare that, to vindicate the public interest in enjoining violations of the Sherman Act, the United States is entitled to attack the validity of patents relied upon to justify anticompetitive conduct otherwise violative of the law. The Court noted that, because of the public interest in free competition, it had repeatedly held that the private licensee-plaintiff in an antitrust suit may attack the validity of the patent under which he is licensed even though he has agreed not to do so in his license. The authorities for this proposition were *Sola Electric Co.* v. *Jefferson Electric*

*Co.,* 317 U. S. 173 (1942); *Edward Katzinger Co.* v. *Chicago Metallic Mfg. Co.,* 329 U. S. 394 (1947); and *MacGregor* v. *Westinghouse Electric & Mfg. Co.,* 329 U. S. 402 (1947). The essence of those cases is best revealed in *Katzinger* where the Court held that, although a patent licensee (under the then-controlling law) was normally foreclosed from questioning the validity of a patent he is privileged to use, the bar is removed when he alleges conduct by the patentee that would be illegal under the antitrust laws, absent the patent. The licensee was free to challenge the patent in these circumstances because the "federal courts must, in the public interest, keep the way open for the challenge of patents which are utilized for price-fixing . . . ." *Id.,* at 399. *Katzinger* and *Gypsum* were much in the tradition of *Pope Mfg. Co.* v. *Gormully,* 144 U. S. 224, 234 (1892): "It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly . . . ," a view most recently echoed in *Lear, Inc.* v. *Adkins,* 395 U. S. 653, 670 (1969).

We think that the principle of these cases is sufficient authority for permitting the Government to raise and litigate the validity of the ICI-Glaxo patents in this antitrust case. According to the record, appellees had issued licenses under their patents that unreasonably restrained trade by prohibiting the licensees from selling or reselling bulk-form griseofulvin and had included in the pooling agreement a covenant to impose such restrictions on licensees. These charges were sustained, the court concluding that the covenant and the patent license provisions were *per se* restraints of trade in the griseofulvin product market.

The District Court was then faced with the Government's attack on the pertinent patents as well as its

demand for mandatory sales and reasonable-royalty licensing, the latter being well-established forms of relief when necessary to an effective remedy, particularly where patents have provided the leverage for or have contributed to the antitrust violation adjudicated. See for example, *Besser Mfg. Co.* v. *United States,* 343 U. S. 444 (1952); *United States* v. *United States Gypsum Co.,* 340 U. S. 76 (1950); *International Salt Co.* v. *United States,* 332 U. S. 392 (1947); *Hartford-Empire Co.* v. *United States,* 323 U. S. 386 (1945). Appellees opposed mandatory sales and compulsory licensing, asserting that the Government would "deny defendants an essential ingredient of their rights under the patent system," and that there was no warrant for "such a drastic forfeiture of their rights." In this context, where the court would necessarily be dealing with the future enforceability of the patents, we think it would have been appropriate, if it appeared that the Government's claims for further relief were substantial, for the court to have also entertained the Government's challenge to the validity of those patents.

In arriving at this conclusion, we do not recognize unlimited authority in the Government to attack a patent by basing an antitrust claim on the simple assertion that the patent is invalid. Cf. *Walker Process Equipment* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172 (1965). Nor do we invest the Attorney General with a roving commission to question the validity of any patent lurking in the background of an antitrust case. But the district courts have jurisdiction to entertain and decide antitrust suits brought by the Government and, where a violation is found, to fashion effective relief. This often involves a substantial question as to whether it is necessary to limit the rights normally vested in the owners of patents, which in itself can be a complex

and difficult issue. The litigation would usually proceed on the assumption that valid patents are involved, but if this basic assumption is itself challenged, we perceive no good reason, either in terms of the patent system or of judicial administration, for refusing to hear and decide it.

The District Court, therefore, erred in striking the allegations of the Government's complaint dealing with the patent validity issue and in refusing to permit the Government to amend its complaint with respect to this issue. On remand, the District Court should consider the validity of the ICI dosage-form patent and the Glaxo microsize patent.

## III

The question remains whether the Government's case for additional relief was sufficient to provide the appropriate predicate for a consideration of its challenge to the validity of these patents. For this purpose, as we have said, its case need not be conclusive, but only substantial enough to warrant the court's undertaking what could be a large inquiry, one which could easily obviate other questions of remedy if the patent is found invalid and which, if the patent is not invalidated, would lend substance to a defendant's claim that a valid patent should not be limited, absent the necessity to provide effective relief for an antitrust violation to which the patent has contributed. Here, we think not only that the United States presented a substantial case for additional relief, but that it was sufficiently convincing that the District Court, wholly aside from the question of patent validity, should have ruled favorably on the demand for mandatory sales and compulsory licensing.

In the first place, it is clear from the evidence that the ICI dosage-form patent, along with other ICI and Glaxo patents, gave the appellees the economic leverage with which to insist upon and enforce the bulk-sales

restrictions imposed on the licensees.[7] Glaxo apparently considered the bulk-sales restriction to be a prerequisite to the granting of a sublicense, for it rejected a draft of the ICI-AMHO agreement because, among other things, it would have permitted AMHO to sell griseo-fulvin in bulk form. There are indications, also, that Glaxo refused a sublicense to others than Schering and J & J because of fears that the companies would sell in bulk form or pressure Glaxo to allow such sales. The

---

[7] The Government argued in the District Court:

"We submit that [*United States* v.] *Gypsum* [333 U. S. 364 (1948)] should be understood more broadly to support challenge to any patent used by antitrust defendants in furtherance of their illegal program. The importance of the Imperial patent to the defendants' scheme to violate the antitrust laws is plain. It was, according to ICI's contentions, the reason for the patent pool agreement in the first place; Glaxo's grant of rights to ICI was paid for with the Imperial patent. Without the Imperial patent the defendants could not maintain their monopoly in the United States over the drug, for then anyone who could secure bulk form griseofulvin could make it up into pills and sell them without a patent to stop him; bulk form griseofulvin is, as ICI points out, unpatented. The Imperial patent thus bolsters the effectiveness of the illegal restraint on alienation ICI imposes on the resale of bulk form griseofulvin: if a small drug company somehow manages to get the unpatented bulk form drug despite ICI's restraint on alienation designed to prevent it or anyone else from doing so, the defendants may still suppress the manufacture of the drug by threat of patent infringe-ment suit. In this context, vindication of the public interest in competition in unpatentable goods is doubly important—for there is a double impediment to commerce—the patent and the conspiracy."

The Government, throughout its brief in this Court, emphasizes the importance of the patents to the antitrust violation.

"In cases like this, the patents involved generally are of major importance in furthering the allegedly unlawful patent licensing practices; they give the defendants the power which enables them to impose the restraints of trade. That is the situation here. The patents were essential to the appellees' scheme to violate the antitrust laws."

source of the patent-pooling agreement pursuant to which such licenses were permitted and which contained the bulk-sales restriction was simple: Glaxo needed the ICI dosage-form patent to assure its licensees the right to use the patent and sell in dosage form. Pooling permitted ICI to engage in bulk manufacture, and, in exchange, ICI imposed the bulk-sales restrictions upon its licensees. There can be little question that the patents involved here were intimately associated with and contributed to effectuating the conduct that the District Court held to be a *per se* restraint of trade in griseofulvin.

Secondly, we think that ICI and Glaxo should have been required to sell bulk-form griseofulvin on reasonable and nondiscriminatory terms and to grant patent licenses at reasonable-royalty rates to all bona fide applicants in order to "pry open to competition" the griseofulvin market that "has been closed by defendants' illegal restraints." *International Salt Co.*, 332 U. S., at 401.

The United States griseofulvin market consists of three wholesalers, all licensees of appellees, that account for nearly 100% of United States sales totaling approximately eight million dollars. Glaxo and ICI have never sold in bulk to others than the licensees and have prohibited bulk sales and resales by the licensees. In practice, the licensees have not manufactured griseofulvin under the bulk-form patents, preferring instead to purchase in bulk form from ICI and Glaxo. The licensees sell the drug in dosage and microsize form to retail outlets at virtually identical prices. The effect of appellees' refusal to sell in bulk and prohibition of such sales by the licensees has been that bulk griseofulvin has not been available to any but appellees' three licensees and that these three are the only sources of dosage-form griseofulvin in the United States.

There is little reason to think that the appellees or their licensees, now that the bulk-sales restrictions have been declared illegal, will begin selling in bulk. It is in

their economic self-interest to maintain control of the bulk form of the drug in order to keep the dosage-form, wholesale market competition-free. Bulk sales would create new competition among wholesalers, by enabling other companies to convert the bulk drug into dosage and microsize forms and sell to retail outlets, and would presumably lead to price reductions as the result of normal competitive forces. There is, in fact, substantial evidence in the record to the effect that other drug companies would not only have entered the market, had they been able to make bulk purchases, but also would have charged substantially lower wholesale prices for the dosage and microsize forms of the drug. Only by requiring the appellees to sell bulk-form griseofulvin on nondiscriminatory terms to all bona fide applicants will the dosage-form, wholesale market become competitive.

Relief in the form of compulsory sales may not, however, alone insure a competitive market. Glaxo and ICI could choose to discontinue bulk-form manufacturing or the sale of griseofulvin in bulk form. The patent licensees might then begin to practice the bulk-form manufacturing patents pursuant to the patent licenses to fill their needs for the bulk drug. The licensees, of course, are not parties to this action, and a mandatory-sales order would not affect them. They would not be required to make the economically less advantageous bulk sales. The bulk form of the drug would be controlled by the licensees, and the appellees, because they would be required under the Government's proposed relief to sell to all applicants only so long as they sell to any United States purchasers, could easily avoid the mandatory-sales requirement. Unless other American firms are licensed to manufacture griseofulvin, competition in the United States market will depend entirely upon appellees' willingness to continue to supply their present licensees with the bulk form of the drug.

This Court has repeatedly recognized that "[t]he framing of decrees should take place in the District rather than in Appellate Courts" and has generally followed the principle that district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *International Salt. Co., supra,* at 400–401; accord, *Ford Motor Co. v. United States,* 405 U. S. 562, 573 (1972). The Court has not, however, treated that power as one of discretion, subject only to reversal for gross abuse, but has recognized "an obligation to intervene in this most significant phase of the case" when necessary to assure that the relief will be effective. *United States v. United States Gypsum Co.,* 340 U. S., at 89. Accordingly, we have ordered the affirmative relief that the District Court refused to implement. See, *e. g., United States v. United States Gypsum Co.* The purpose of relief in an antitrust case is "so far as practicable, [to] cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *Id.,* at 88. Mandatory selling on specified terms and compulsory patent licensing at reasonable charges are recognized antitrust remedies. See, *e. g., Besser Mfg. Co. v. United States,* 343 U. S. 444 (1952); *International Salt Co. v. United States,* 332 U. S. 392 (1947); *Hartford-Empire Co. v. United States,* 323 U. S. 386 (1945). The District Court should have ordered those remedies in this case.

To the extent indicated in this opinion, the judgment of the District Court is reversed.

*So ordered.*

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART and MR. JUSTICE BLACKMUN concur, dissenting.

The Court has undertaken to substitute its judgment for that of Congress in the initiation of novel procedures for the determination of patent validity, and in so doing

has blandly disregarded the procedural history of this case.

I

There is neither statutory nor case authority for the existence of a general right of either private individuals or the Government to collaterally challenge the validity of issued patents. In the Patent Act of 1790, Congress provided that private citizens could, upon motion alleging fraudulent procurement, prompt a district court to issue to a patentee an order to show cause why his letters patent should not be repealed.[1] A substantially identical provision was carried over in the Patent Act of 1793.[2] But the Patent Act of 1836 contained no provision for such individual actions although it increased the number of statutory defenses in infringement actions.[3] The effect of this omission was determined by *Mowry* v. *Whitney*, 14 Wall. 434 (1872), to be the preclusion of private actions to cancel patents, even when fraudulently procured.

As part of the rationale in *Mowry*, the Court reasoned that the equitable suit for cancellation of a patent because it was fraudulently procured was a substitute for the writ of *scire facias* and, accordingly, it should have the same limitations. In dictum, the Court stated: "The fraud, if one exists, has been practiced on the government, and as the party injured, it is the appropriate party to assert the remedy or seek relief." *Id.,* at 441. When the United States later sued to set aside two patents issued to Alexander Graham Bell subsequent to several pur-

---

[1] 1 Stat. 109. For an excellent review of the history briefly summarized here, see Cullen & Vickers, Fraud in the Procurement of a Patent, 29 Geo. Wash. L. Rev. 110 (1960).

[2] 1 Stat. 318.

[3] 5 Stat. 117.

ported acts of fraud by him on the Patent Office, this Court relied heavily on the dictum in *Mowry, supra,* in recognizing the right of the Federal Government to sue for the cancellation of letters patent obtained by fraud:

> "That the government, authorized both by the Constitution and the statutes to bring suits at law and in equity, should find it to be its duty to correct this evil, to recall these patents, to get a remedy for this fraud, is so clear that it needs no argument . . . ." *United States* v. *Bell Telephone Co.,* 128 U. S. 315, 370 (1888) (*Bell I*).

The Government asserts that the breadth of this holding was established in the dictum in *United States* v. *Bell Telephone Co.,* 159 U. S. 548 (1895) (*Bell II*), wherein the Court upheld its appellate jurisdiction in such patent cancellation cases. There, it was stated:

> "In *United States* v. *Telephone Company,* [128 U. S. 315], it was decided that where a patent for a grant of any kind issued by the United States has been obtained by fraud, by mistake or by accident, a suit by the United States against the patentee is the proper remedy for relief, and that in this country, where there is no kingly prerogative but where patents for land and inventions are issued by the authority of the government, and by officers appointed for that purpose who may have been imposed upon by fraud or deceit, or may have erred as to their power, or made mistakes in the instrument itself, the appropriate remedy is by proceedings by the United States against the patentee." *Id.,* at 555.

But in *United States* v. *Bell Telephone Co.,* 167 U. S. 224 (1897) (*Bell III*), the Court characterized the above-quoted language as a "general statement" of the power

of the Government to maintain a suit and, again in dictum, limited its effect, saying:

"But while there was thus rightfully affirmed the power of the Government to proceed by suit in equity against one who had wrongfully obtained a patent for land or for an invention, there was no attempt to define the character of the fraud, or deceit or mistake, or the extent of the error as to power which must be established before a decree could be entered cancelling the patent. It was not affirmed that proof of any fraud, or deceit, or the existence of any error on the part of the officers as to the extent of their power, or that any mistake in the instrument was sufficient to justify a decree of cancellation. Least of all was it intended to be affirmed that the courts of the United States, sitting as courts of equity, could entertain jurisdiction of a suit by the United States to set aside a patent for an invention on the mere ground of error of judgment on the part of the patent officials. That would be an attempt on the part of the courts in collateral attack to exercise an appellate jurisdiction over the decisions of the Patent Office, although no appellate jurisdiction has been by the statutes conferred. . . ." *Id.,* at 269.

The plain import of the *Bell* cases is that the authority of the Government to bring an independent action to cancel a patent is confined to the traditional equitable grounds of fraud, mistake, and deceit. The Government makes two arguments to support its position that it should not be as limited here. It contends that since this is an antitrust action, its right to attack the validity of the patent is established by the rationale of *United States* v. *United States Gypsum Co.,* 333 U. S. 364 (1948), and is therefore not subject to the limitations of *Bell III.* Alternatively, it argues that *Bell III* has been so under-

cut by subsequent decisions, including *Gypsum,* that it should no longer be followed.

In *Gypsum Co., supra,* the Court stated in "deliberate *dicta*" that the Government may challenge the validity of a patent which has been asserted by an antitrust defendant to be a defense to the Government's claim of antitrust violations. It reasoned that in a suit to vindicate the public interest by enjoining violations of the Sherman Act, the United States should have the opportunity, similar to that afforded licensees in an action for royalties, to show that an asserted shield of patentability does not exist. *Id.,* at 386–388.

The *Bell* cases enunciate the range of the Government's authority, quite independent of any other litigation it may have with a patentee, to attack a governmental grant from the Patent Office obtained by the sort of fraud or mistake there described. The *Gypsum* doctrine, on the other hand, sprang from the right of the Government as a civil plaintiff under the antitrust laws to assert the invalidity of a patent grant set up as a defense to its civil complaint. Since a private licensee may attack the validity of a patent that is made the basis of an action against him for royalties, the Government should, equally, have the right to attack a patent that is set up as a defense by the patentee in the Government's action.

The Government's claim here essentially falls between these two limited grants of authority. A claim of lack of patentability, without more, is not within the Government's authority *qua* government to set aside a patent for fraud or mistake. And since the decision of the merits of the Government's claim of antitrust violation against these appellees in no way required the court to determine the validity of their patents, the reasoning of *Gypsum* is not applicable. The Government may, therefore, prevail only if we are to blur the distinction between

these separate grants of authority, and extend such authority to circumstances that are within the rationale of neither.

Certainly, it is true, as the Court states, that there is a public interest favoring the judicial testing of patent validity and the invalidation of specious patents. See, *e. g., Blonder-Tongue* v. *University Foundation,* 402 U. S. 313, 343–344 (1971); *Lear, Inc.* v. *Adkins,* 395 U. S. 653, 657, 664 (1969). For when a patent is invalid, "the public parts with the monopoly grant for no return, the public has been imposed upon and the patent clause subverted." *United States* v. *Singer Mfg. Co.,* 374 U. S. 174, 197, 199–200 (1963) (WHITE, J., concurring).

Significant recognition is given to this interest by both the *Bell* and *Gypsum* doctrines. Additional authority resides in the Government to obtain judicially decreed restrictions on patent monopoly in appropriate cases where the defendant's antitrust violations have consisted, at least in part, of patent misuse. *International Salt Co.* v. *United States,* 332 U. S. 392 (1947); *Hartford-Empire Co.* v. *United States,* 323 U. S. 386 (1945); *Morton Salt Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488 (1942). But the sort of roving commission that the majority now authorizes whereby the Government may request a court to invalidate any patent owned by an antitrust defendant that in any way related to the factual background of the claimed antitrust violation cannot be regarded as a reasonably necessary extension of any of these principles. It is, therefore, more properly the creature of statute than of judicial innovation.

## II

Although the Court purports to limit its holding to avoid giving the Government such a roving commission, the range of the new authority is pointed up by the facts in this case.

The Government submitted its case to the District Court in three motions for partial summary judgment on the very narrow issue that the vertical restrictions on the resale of bulk-form griseofulvin constituted *per se* violations of the antitrust laws under the *Schwinn* doctrine.[4] *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365 (1967). Although common bulk-form griseofulvin is the subject of a British manufacturing patent owned by Glaxo, it is neither patented nor patentable in the United States.

The two patents that this Court is now authorizing the Government to challenge bear no relationship whatsoever to the illegal restraint found. The ICI patent relates only to the dosage form of the drug. The majority states that "it is clear from the evidence that the ICI dosage-form patent . . . gave the appellees the economic leverage with which to insist upon and enforce the bulk-sales restrictions imposed on the licensees." *Ante,* at 60–61. But no such evidence was submitted in the Government's statement of undisputed facts that accompanied its motions for partial summary judgment on the restraint-of-alienation issue. And no such fact was included in the District Court's findings of undisputed or ultimate facts. The District Court found precisely the opposite:

> "Plaintiff has not shown on this record that defendants' current licensing practices are related to the adjudged antitrust violation nor are they methods to circumvent the prohibition of restraints on resale. . . ." 328 F. Supp. 709, 713.

---

[4] The majority inaccurately states that the lower court sustained the allegations in the complaint that appellees had unreasonably restrained trade by prohibiting the licensee from selling or reselling bulk-form griseofulvin. In fact, the District Court only found that the restraint on reselling bulk-form griseofulvin constituted the *per se* antitrust violations found.

Since the Court's factual assumption as to economic leverage is completely contrary to the finding of the District Court, presumably the Court without saying so is holding that finding to be clearly erroneous. Yet the only support for such a holding, to which the Court refers, is an unverified statement contained in the Government's argument to the District Court on this issue. While the Government has an impressive batting average in this Court as an antitrust litigant, it has not heretofore had the benefit of having unverified assertions of its counsel treated as being of sufficient evidentiary weight to upset a considered factual finding of the District Court in which that argument was made. Nothing in the antitrust laws or in the Federal Rules of Civil Procedure exempts the Government from having to make its case in the trial court in the same manner as any other litigant. The Court's conclusion that there "can be little question that the patents involved here were intimately associated with and contributed to effectuating the conduct that the District Court held to be a *per se* restraint of trade in griseofulvin," *ante,* at 62, is thus reached only by a substantial departure from the settled usages of appellate review.

Similarly, the other patent which the Government may now have declared invalid was not even granted until 1967, and it, too, relates to the dosage form of the drug. Since the restraints on alienation were imposed in the early 1960's, there cannot be a plausible contention that it in any way provided "economic leverage" for the antitrust violations. And there was no other proof of its relationship to the bulk-form market and the antitrust violations.[5] Thus, the scope of the new authority ex-

---

[5] This total lack of proof of any relationship also defeats for me the granting of compulsory licensing of the United States patents. Compulsory licensing is a recognized remedy in patent misuse cases, see, *e. g., International Salt Co.* v. *United States,* 332 U. S. 392

tends to any patent that happens to be present in a patent-licensing agreement that contains a restraint on alienation in a different market, regardless of its relationship to such restraint.

Since there is no congressional authorization for the challenge by the Government to the validity *vel non* of patents without regard to the relationship to antitrust violations, and since there was no proved relationship between these violations and the patents in question, I would affirm the judgment and orders of the District Court. I therefore dissent.

---

(1947), *Hartford-Empire Co.* v. *United States,* 323 U. S. 386 (1945), but here the District Court specifically found there was no patent misuse or other abuse of patent rights.