[Civ. No. 33051. First Dist., Div. One. Aug. 6, 1973.]

SHOEI KAKO CO., LTD., Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
EDWARD MacISAAC, Real Party in Interest.

**COUNSEL**

Baker, Ancel & Redmond and Peter M. Glick for Petitioner.

No appearance for Respondent.

Boccardo, Blum, Lull, Niland, Teerlink & Bell, Robert R. Catalano and Moless & Chavez for Real Party in Interest.

## OPINION

SIMS, J.—By its petition for writ of mandate, the petitioner, a Japanese corporation, seeks review of an order of the trial court which denied its motion to quash the service of summons purportedly effected by mailing a copy of the summons and complaint to its head office in Japan. (See Code Civ. Proc., § 418.10.) An alternative writ was issued and after argument the matter was submitted on the petition, the exhibits filed therewith, and the memorandum of points and authorities in opposition to the petition, and the return filed by real party in interest.

Petitioner contends: (1) that the record fails to show facts which would render it subject to a judgment in personam in this state; that the trial court is without jurisdiction to render a judgment against it (2) because the method used to perfect service of process was not in accordance with an international treaty governing service abroad of judicial and extrajudicial documents, and (3) because the notice given by the service of process failed to comply with due process of law because it was not written in the language of the country to which it was mailed. A review of these contentions reveals that they are without merit. The alternative writ must be discharged and the petition for a peremptory writ denied.

The complaint filed by real party in interest on August 20, 1971, reflects that this action arises out of a collision on December 24, 1970, between a motorcycle operated by real party in interest, the plaintiff in the action below and so referred to herein, and a vehicle allegedly negligently operated by the defendant Shirley Ann Hardesty; that at the time of the accident the plaintiff was wearing a Dias Safety Helmet with a designated serial number; and that he received severe personal injuries as a proximate result of the collision and of the failure of the helmet, for which he seeks to recover $1,500,000 general damages and special damages and loss of earnings according to proof. The first cause of action is directed at the negligence of those who designed, manufactured, constructed, tested, repaired, sold, retailed, wholesaled, and distributed the safety helmet. The second cause of action is directed at the same defendants for breach of an

implied warranty that the saftey helmet was fit for the use for which it was designed and intended. The third cause of action, against the same defendants, is predicated upon the theory of product liability. The fourth cause of action is based upon the negligence of the driver and those responsible for the operation of the other vehicle; and the fifth cause of action is grounded upon the concurrent negligence of all defendants.

Among the named defendants is D. S. *Kogaco* Company, Ltd., a corporation.

The petitioner, Shoei Kako Co., Ltd., according to the declaration filed on its behalf, is a corporation organized and existing under and in accordance with the laws of Japan with its principal and main office in Tokyo. Admittedly petitioner assumed the responsibility for all debts and obligations of D. S. *Kagako Co., Ltd.,* a corporation formerly organized and existing under and in accordance with the laws of Japan, with its principal and main office in Tokyo because the latter corporation was merged into the petitioning corporation after December 24, 1970.

I

Section 410.10 of the Code of Civil Procedure provides: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." The basic underlying rule is found in *Internat. Shoe Co.* v. *Washington* (1945) 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057] wherein the court referred to "sufficient contacts or ties with the state of the forum to make it reasonable and just, according to our traditional conception of fair play and substantial justice, to permit the state to enforce the obligations which [the nonresident] has incurred there." (326 U.S. at p. 320 [90 L.Ed. at p. 104].) In recommending the passage of section 410.10 to the Legislature, the Judicial Council followed the format found in the Restatement Second Conflict of Laws (1971). (See Judicial Council of Cal., Annual Rep. (1969) Appendix II, at p. 68, pp. 85-91; and cf. Rest.2d Conflict of Laws, §§ 41-42.)

In an effort to meet the criteria so enunciated petitioner filed an affidavit, dated February 20, 1973, of an employee, who was also an employee of the merged corporation, in which he alleges that neither corporation has done business in, has qualified to do business in, has made or contracted to perform any contracts in, has made or contracted to supply services or things in, has maintained any employees, agents or other representatives in, had any interest in real property in, has caused any tortious

injury by act or omission in, has contracted to insure any person, property or risk located in, or has designated any agent for purposes of service of process within the State of California, or any states of the United States or its territories or possessions. He acknowledges that the sole and only contact within the State of California and any state of the United States or its territories of either corporation is an equitable interest of the corporations in one California corporation.

The plaintiff relies upon proffered evidence which he claims shows that the petitioner's predecessor was subject to the jurisdiction of this state because it manufactured a defective helmet which caused an effect, the injuries suffered by plaintiff, within this state. In *Buckeye Boiler Co.* v. *Superior Court* (1969) 71 Cal.2d 893 [80 Cal.Rptr. 113, 458 P.2d 57], the court stated: "A manufacturer whose products pass through the hands of one or more middlemen before reaching their ultimate users cannot disclaim responsibility for the total distribution pattern of the products. If the manufacturer sells its products in circumstances such that it knows or should reasonably anticipate that they will ultimately be resold in a particular state, it should be held to have purposefully availed itself of the market for its products in that state." (71 Cal.2d at p. 902.) It continued: "When a plaintiff is allegedly injured in the forum state by a defect in a nonresident manufacturer's product, the question whether that product's use or purchase was an isolated instance or part of a continuous course of business in the state is relevant but not necessarily decisive in determining the existence or nonexistence of the requisite jurisdictional activity. [Citations.] Only if isolated use or purchase conclusively establishes lack of foreseeability that the product will enter the state is the isolation necessarily fatal to jurisdiction over the manufacturer; in that event there is a manifest lack of purposeful activity on the part of the manufacturer." (*Id.*, p. 904. See also *Hall* v. *University of Nevada* (1972) 8 Cal.3d 522, 525 [105 Cal.Rptr. 355, 503 P.2d 1363]; *Martin* v. *Detroit Lions, Inc.* (1973) 32 Cal.App.3d 472, 475-476 [108 Cal.Rptr. 23]; *Ault* v. *Dinner for Two, Inc.* (1972) 27 Cal.App.3d 145, 151 [103 Cal.Rptr. 572]; *Agalite-Bronson Co.* v. *K. G. Limited* (1969) 270 Cal.App.2d 308, 315-316 [75 Cal.Rptr. 527]; *Duple Motor Bodies, Ltd.* v. *Hollingsworth* (9th Cir. 1969) 417 F.2d 231, 233-236; *Yoder* v. *Yamaha International Corporation* (E.D.Pa. 1971) 331 F.Supp. 1084, 1086-1087; *Gill* v. *Fairchild Hiller Corp.* (D.N.H. 1970) 312 F.Supp. 916, 917-918; *Omstead* v. *Brader Heaters, Inc.* (1971) 5 Wn.App. 258, 270-272 [487 P.2d 234, 242-243] affd. and opn. adopted (1972) 80 Wn. 2d 720 [497 P.2d 1310]; *Certisimo* v. *Heidelberg Company* (1972) 122 N.J.Super. 1, 13-14 [298 A.2d 298, 305]; and Annot., Products Liability (1968) 19 A.L.R.3d 13. Cf. *Fisher*

*Governor Co.* v. *Superior Court* (1959) 53 Cal.2d 222, 226 [1 Cal.Rptr. 1, 347 P.2d 1]; *Vibration Isolation Products, Inc.* v. *American Nat. Rubber Co.* (1972) 23 Cal.App.3d 480, 483-484 [100 Cal.Rptr. 269]; and *Tiffany Records, Inc.* v. *M. B. Krupp Distributors, Inc.* (1969) 276 Cal. App.2d 610, 615-619 [81 Cal.Rptr. 320].)

In order to trace that the helmet worn by plaintiff was one manufactured by petitioner's predecessor for general distribution in the United States, plaintiff presented a copy of a form of declaration purportedly executed by an officer of a testing corporation in which it is recited that the testing corporation's serial number found in the helmet involved "was issued to D. S. Kagaku Co., Ltd. on January 22, 1969." Although the signed original of this declaration does not appear in the record, petitioner apparently does not seriously question the accuracy of that declaration.

Plaintiff also relies upon written answers to interrogatories filed by other parties to the action. On March 5, 1973, three days after argument on petitioner's motion but prior to the submission and decision of the matter, plaintiff filed the answers to interrogatories of the defendant Newman Company, a corporation from which it appears that certain helmets which that company sold to defendant Gemco Co. prior to plaintiff's accident were imported from Sunrise & Co., a trading company which bought the helmets from D. S. Kagaku (now Shoei Kako Co.) Ltd., named as manufacturer in the answers, and that other helmets were purchased from Standard Sales, a Los Angeles importer, and from Nelson Sales, a Kansas City, Kansas importer. In the return filed with this court plaintiff has included what purports to be a verification of the foregoing answers executed and served and filed in May 1973 after the petition was filed in this court. Also attached to the return is what purports to be a copy of answers to interrogatories propounded by National Industries, d.b.a. Nelson Sales Co. to Gemco Stores. ▮ The answers of one party elicited in response to interrogatories propounded by another cannot be used as evidence against a third party. (*Petersen* v. *City of Vallejo* (1968) 259 Cal.App.2d 757, 776 [66 Cal.Rptr. 776]; *Associates Discount Corp.* v. *Tobb Co.* (1966) 241 Cal.App.2d 541, 550-552 [50 Cal.Rptr. 738]. See Code Civ. Proc., §§ 2030, subd. (a) and 2016, subd. (d).) If it be assumed that the delayed verification of the Newman Company's answers transformed them into an affidavit, the fact remains that neither that verification nor the Gemco Stores' answers were in the record before or available to the trial court.

▮ Stripped of unsigned declarations and extraneous answers there is little, if anything, to show that petitioner's predecessor had any contacts

with this state. The declaration of plaintiff states that he purchased the helmet from Gemco Co. prior to the accident, and that it had the testing corporation's numbered sticker in it. At best, under petitioner's concession, the evidence shows that plaintiff purchased a helmet which had in it a label secured by petitioner's predecessor from the testing corporation which is also named as a defendant.

There is, however, further evidence to show that both petitioner and the merged corporation were doing business in the state, or at the least, doing acts in this state which were related to the distribution and sale of similar helmets. One Philip K. Huff executed a declaration in which he stated that prior to July 15, 1968, he was doing business in this state under the name D. S. Kagaku Co., and that on that date he incorporated and carried a business under the name D. S. Safety Helmet Corporation. The declaration of plaintiff's attorney reflects that on December 9, 1971, Huff, as vice-president of D. S. Safety Helmet Corporation gave him a card bearing that legend with a Los Angeles address for the corporation, and the further endorsement "D. S. Kagaku Co., Ltd." with the Tokyo address of that corporation. An investigator for the plaintiff filed a declaration that on January 13, 1973, at a motorcycle and accessories trade show in Long Beach there was in charge of a booth one Philip K. Huss (sic, Huff) which housed helmets manufactured by petitioner, and that "Huss" was advertising and selling the merchandise. Copies of the brochures distributed bear petitioner's name with its head office designated at the Tokyo address used by the merged corporation, and, as well, reference to Shoei Safety Helmet Corp. at the Los Angeles address used by Huff.

Although in view of the legal evidence suggested, plaintiff's actual presentation is shockingly incomplete, it must be viewed in the light of petitioner's failure to respond to the material presented by plaintiff, other than to question the method of service.

The fact that the helmet was found in channels of retail trade in this state, that there was an ostensible representative of the merged corporation within this state (without, however, proof of actual or ostensible authority from the merged corporation), and that this representative later appeared promoting the sales of the successor corporation, suggests, in the absence of more specific declarations to the contrary, that the merged corporation should have reasonably anticipated that its products would be resold in this state, and was in effect purposefully availing itself of the market for its products in this state when it sold them to Japanese ex-

porters or American importers. The evidence sustains the implied finding of the trial court that there were sufficient contacts with this state to uphold the exercise of in personam jurisdiction if petitioner was given the notice required by law.

## II

Petitioner acknowledges that on or about January 9, 1973, it received a document entitled "Notice and Acknowledgment of Receipt" (see Code Civ. Proc., § 415.30; and Cal. Rules of Court, rule 982(4))[1] addressed to

---

[1]Code of Civil Procedure section 415.30 provides:

"(a) A summons may be served by mail as provided in this section. A copy of the summons and of the complaint shall be mailed (by first-class mail or airmail, postage prepaid) to the person to be served, together with two copies of the notice and acknowledgment provided in subdivision (b) and a return envelope, postage prepaid, addressed to the sender.

"(b) The notice specified in subdivision (a) shall be in substantially the following form:

"(Title of court and cause, with action number to be inserted by the sender prior to mailing.)

### "NOTICE

"To: (Here state the name of the person to be served.)

"This summons is served pursuant to Section 415.30 of the California Code of Civil Procedure. Failure to complete this form and return it to the sender within 20 days may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons upon you in any other manner permitted by law. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, this form must be signed in the name of such entity by you or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. Section 415.30 provides that this summons is deemed served on the date of execution of an acknowledgment of receipt of summons.

"_____
Signature of sender

### "ACKNOWLEDGMENT OF RECEIPT OF SUMMONS

"This acknowledges receipt on (insert date) of a copy of the summons and of the complaint at (insert address).

"Date: _____
(Date this acknowledgment is executed)

Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person.

"(c) Service of a summons pursuant to this section is deemed complete on the date a written acknowledgment of receipt of summons is executed, if such acknowledgment thereafter is returned to the sender.

"(d) If the person to whom a copy of the summons and of the complaint are mailed pursuant to this section fails to complete and return the acknowledgment form set forth in subdivision (b) within 20 days from the date of such mailing, the party to whom the summons was mailed shall be liable for reasonable expenses thereafter in-

D. S. *Kogaco* Co., Ltd. 2-9-2 Shimbashi Minato-Ku, Tokyo 105, Japan together with a copy of the complaint in the pending action.

Plaintiff produced a form of "Notice and Acknowledgment of Receipt," in the form prescribed by statute and rule of court, dated January 4, 1973, and addressed to D. S. *Kogacu* Company Limited, sued herein as D. S. *Kogaco* Company Ltd." and bearing the legend "You Are Served Herein as Doe Two." The acknowledgment prescribed by statute and rule of court was not executed, but plaintiff produced what appears to be a form of international mail receipt written in the English and French languages. It contains the following, apparently inserted by the addressee: "Addressee (Name or firm) D. S. *Kogaku Co. Ltd.*, Street and No. *2-9-2 Shinbashi* Place and Country *Minato-ku, Tokyo 105, Japan*." The legend "This receipt must be signed by the addressee or by a person authorized to do so by virtue of the regulations of the country of destination, or, if those regulations so provide, by the employee of the office of destination, and returned by the first mail directly to the sender" is followed by the printed recital, "The article mentioned above was duly delivered. Date." In the appropriate blank there is inserted in script, undecipherable on the copy made available to the court, but allegedly, "Jan. 8, 1973." Following the form's printed "Signature of the employee of the office of destination" is a signature which appears to be "Miyoka Aoki." This is followed by a postmark, apparently endorsed in connection with the return of the receipt, which indicates a mailing date of January 9, 1973.

On February 1, 1973, the plaintiff's attorney addressed a registered letter to D. S. Kogacu Ltd., at the address referred to above. This letter alleges that the addressee was served with a copy of the summons and complaint on January 8, 1973. It states that the time within which to answer expired January 29, 1973.[2] It threatened that unless a responsive pleading

---

curred in serving or attempting to serve the party by another method permitted by this chapter, and, except for good cause shown, the court in which the action is pending, upon motion, with or without notice, shall award the party such expenses whether or not he is otherwise entitled to recover his costs in the action.

"(e) A notice of acknowledgment of receipt in form approved by the Judicial Council is deemed to comply with this section."

[2]No service is effected under the provisions of section 415.30 until the written acknowledgment of receipt of summons is executed, and then returned to the sender (§ 415.30, subd. (c), see fn. 1, above. See also §§ 417.20, subd. (a) and 417.10, subd. (a).) The expiration of the 20 days, after the mailing of the papers, only gave the plaintiff the right to recover costs thereafter expended in serving or attempting to serve the party by another method if the addressee failed to execute the receipt (see § 415.30, subd. (d), fn. 1 above). The Judicial Council comment to section 415.30 states in part: "Section 415.30 provides one of two methods authorized by this article for delivering process by mail to the person or persons to be served. The other method

was filed by February 15, 1973, the plaintiff would "take default and judgment against [the addressee] in the amount prayed for i.e., $1,500,000.00." On February 16, 1973, petitioner mailed, and on February 20, 1973, there was filed its "Notice Of Motion To Quash Service Of Summons For Lack Of Personal Jurisdiction Or To Stay Or Dismiss Action On Ground Of Convenient Forum."[3]

Section 413.10 provides in pertinent part, "Except as otherwise provided by statute, a summons shall be served on a person: . . . [¶] (c) Outside the United States, as provided in this chapter or as directed by the court in which the action is pending, or, if the court before or after service finds that the service is reasonably calculated to give actual notice, as prescribed by the law of the place where the person is served or as directed by the foreign authority in response to a letter rogatory." Sections 415.30 and 415.40 (see fns. 1 and 2 above) are within the same chapter, and each, therefore, is an authorized method of effecting service outside the United States.

Section 417.20 provides in pertinent part: "Proof that a summons was served on a person outside this state shall be made: [¶] (a) If served in a manner specified in a statute of this state, as prescribed by Section 417.10, and if service is made by mail pursuant to Section 415.40, proof of service shall include evidence satisfactory to the court establishing actual delivery to the person to be served, by a signed return receipt or other evidence; . . ." Section 417.10 provides with respect to service under section 415.30, ". . . If service is made by mail pursuant to Section 415.30, proof of service shall include the acknowledgment of receipt of summons in the form provided by that section or other written acknowledgment of receipt of summons satisfactory to the court." (See also § 415.30, subd.

of mail service is specified in Section 415.40. . . ." (See also comment to section 415.40; and Note, *Service by Mail Provisions of California's New Jurisdiction Statute* (1970) 21 Hastings L.J. 1281.)

Section 415.40 provides: "A summons may be served on a person outside this state in any manner provided by this article or by sending a copy of the summons and of the complaint to the person to be served by any form of airmail requiring a return receipt. Service of a summons by this form of mail is deemed complete on the 10th day after such mailing."

Under this section the service of the summons and complaint would be deemed completed 10 days after the mailing, presumably at sometime in the period embraced between January 4, 1973 the date of the notice, and January 8, 1973 when it was received. No default could be entered until 40 days after that date (see § 412.20, subd. (a)(3).)

[3]Neither the motion itself nor the points and authorities filed in support of the motion, nor the petition filed with this court pursues the question of staying or dismissing the action on the ground of inconvenient forum. (See Code Civ. Proc., § 410.30.) It may therefore be disregarded in these proceedings. (*Martin* v. *Detroit Lions, Inc.* (1973) 32 Cal.App.3d 472, 477 [108 Cal.Rptr. 23].)

(c), fn. 1 above.) No proof of a formal acknowledgement under section 415.30 was presented to the court. The court, however, under the statute could accept the signed return receipt as satisfactory evidence of actual delivery to the person to be served. (Cf. *Stamps* v. *Superior Court* (1971) 14 Cal.App.3d 108, 110 [92 Cal.Rptr. 151].)

 The adequacy of service "so far as due process is concerned is dependent on whether or not the form of substituted service provided for such cases and employed is reasonably calculated to give him actual notice of the proceedings and an opportunity to be heard. If it is, the traditional notions of fair play and substantial justice [citation] implicit in due process are satisfied." (*Milliken* v. *Meyer* (1940) 311 U.S. 457, at p. 463 [85 L.Ed. 278, at p. 283, 61 S.Ct. 339, 132 A.L.R. 1357]. See also Rest.2d (1971) Conflict of Laws, § 25.) Here there is no question but that petitioner has received actual notice and an opportunity to be heard.[4] It insists, however, that the notice was inadequate under international treaty.

The second clause of article VI of the United States Constitution provides as follows: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the

---

[4]Subdivision (i) of rule 4 of the Federal Rules of Civil Procedure provides "Alternate Provisions for Service in a Foreign Country." It reads in pertinent part, "(1) Manner. When the federal or state law referred to in subdivision (e) of this rule authorizes service upon a party not an inhabitant of or found within the state in which the district court is held, and service is to be effected upon the party in a foreign country, it is also sufficient if service of the summons and complaint is made: . . . (D) by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served; . . . [¶] (2) Return. . . . When service is made pursuant to subparagraph (1)(D) of this subdivision, proof of service shall include a receipt signed by the addressee or other evidence of delivery to the addressee satisfactory to the court."

Under the foregoing provisions it has been held that a foreign resident who has committed a tortious act within the state where the federal District Court is located may be served abroad by mail. (*Miller* v. *Steinbach* (S.D.N.Y. 1967) 43 F.R.D. 275, 278. See also *United States* v. *Glaxo Group Limited* (D.C. 1969) 302 F.Supp. 1, 3 [revd. on other grounds 410 U.S. 52 (35 L.Ed.2d 104, 93 S.Ct. 861)].) The federal courts have generally recognized the sufficiency of service by mail on parties outside of the United States when jurisdiction otherwise existed. (See *Zurini* v. *United States* (8th Cir. 1951) 189 F.2d 722, 726; *Aero Associates, Inc.* v. *La. Metropolitana* (S.D.N.Y. 1960) 183 F.Supp. 357, 359; *Hoffman* v. *Herdman's Ltd.* (S.D.N.Y. 1966) 41 F.R.D. 275, 279; *United States* v. *Cardillo* (W.D.Pa. 1955) 135 F.Supp. 798, 800; and 4 Wright & Miller, Federal Practice and Procedure (1969) § 1134. pp. 563-564, and § 1136, p. 567. Cf. *James Talcott, Inc.* v. *Allahabad Bank, Ltd.* (5th Cir. 1971) 444 F.2d 451, 463-466 [cert. den., 404 U.S. 940 (30 L.Ed.2d 253, 92 S.Ct. 280)] [service by publication]. See also *Certisimo* v. *Heidelberg Company, supra*, 122 N.J.Super. 1, 3 [298 A.2d 298, 299].)

supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." This state, therefore, cannot attempt to exercise jurisdiction if to do so would violate an international treaty. (See *United States* v. *Pink* (1942) 315 U.S. 203, 230, 234 [86 L.Ed. 796, 817-818, 820, 62 S.Ct. 552]; *Hauenstein* v. *Lynham* (1879) 100 U.S. 483, 488-490 [25 L.Ed. 628, 630-631]; and *Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 819-820 [25 Cal.Rptr. 798].)

On February 10, 1969, following prior ratification and proclamation, the United States of America became bound by the provisions of a multilateral international convention governing "Service Abroad of Judicial and Extrajudicial Documents." (20 U.S.T. 361-367.) A declaration filed on behalf of petitioner indicates that the convention became effective, subject to certain objections noted below, as to Japan on or about July 27, 1970. The difficulties giving rise to the convention, which was agreed upon at The Hague, November 15, 1965, have been documented. (See Jones, *International Judicial Assistance* (1953) 62 Yale L.J. 515, 534-538; and Smit, *International Aspects of Federal Civil Procedure* (1961) 61 Colum.L.Rev. 1031, 1032-1043.)

Article 1 of the treaty provides: "The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." Articles 2 through 6 establish a system whereby each contracting state shall organize and designate a "Central Authority" which will undertake to receive, and to reject or to execute, and to certify requests for service of process from other contracting states. Other methods of service are recognized. Article 8 permits service to be effected upon persons abroad through diplomatic or consular agents unless opposition has been declared by the state involved to such service on others than nationals of the originating state. Article 9 permits service by forwarding documents for service through consular or diplomatic channels to authorities who are authorized to effect service. The controversy in this case revolves about the provisions of article 10, which reads: "Provided the State of destination does not object, the present Convention shall not interfere with—(a) the freedom to send judicial documents, by postal channels, directly to persons abroad, (b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials, or other competent persons of the State of destination, (c) the freedom of any person interested in a judicial proceeding

to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."

According to the record the Japanese Government's adherence to the convention recites, "We hereby declare that the employment of the methods of service and notice of Article 10 (b) and (c) shall be refused."

Article 15 of the convention is the equivalent of our national due process concept, and it was so recognized in the Senate. (See, Cong. Rec., Senate proceedings (April 13, 1967) p. 404.) That section provides in part: "Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared, judgment shall not be given until it is established that—(a) the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or (b) the document was actually delivered to the defendant or to his residents by *another method provided for by this Convention,* and that in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend." (Italics added.)

The plaintiff contends that since the provisions of subdivision (a) of article 10 are effective both as to the United States and Japan, he was free to send the summons and complaint by postal channels directly to the petitioner; and that if there was actual delivery to the corporate residence by the postal authorities, as is evidenced by the return receipt, the courts of this state would not be precluded from giving judgment against petitioner if it failed to appear.

On the other hand, petitioner points out that the convention persistently refers to "service" ("service abroad," art. 1; "requests for service," art. 2; "document to be served," art. 3: "serve the document or shall arrange to have it served," art. 5; "the document has been served," art. 6; "effect service of judicial documents," art. 8; "forward documents, for the purpose of service," art. 9; "effect service of judicial documents," art. 10, subds. (b) and (c); "for the purpose of service of judicial documents," art. 11; "service of judicial documents," art. 12; "request for service," art. 13; "transmission of judicial documents for service," art. 14; "transmitted abroad for the purpose of service," art. 15 and art. 16.) Petitioner notes that subdivision (a) of article 10 refers to "the freedom to *send* judicial documents by postal channels, directly to persons abroad," (italics added) as distinguished from the transmission abroad for the purposes of service. It claims that the subsection does not authorize service by mail if actual

delivery is effected, but that it merely authorizes the giving of notices and exchange of other judicial documents after jurisdiction is acquired. It draws an analogy between service of summons as provided in chapter 4 (§§ 413.10-417.40) of title 5 of the Code of Civil Procedure, and chapter 5 (§§ 1010-1020) of title 14 of that code which refers to notices and filing and service of papers, and expressly authorizes service by mail in such cases (see §§ 1012, 1013 and 1013a). The latter provisions expressly do not apply to the service of summons (§ 1016).

Although there is some merit to the proposed distinction it is outweighed by consideration of the entire scope of the convention. It purports to deal with the subject of service abroad of judicial documents. The reference to "the freedom to send judicial documents by postal channels, directly to persons abroad" would be superfluous unless it was related to the sending of such documents for the purpose of service. The mails are open to all. Moreover, the reference appears in the context of other alternatives to the use of the "Central Authority" created by the treaty. If it be assumed that the purpose of the convention is to establish one method to avoid the difficulties and controversy attendant to the use of other methods (see Miller, *International Cooperation* (1965) 49 Minn.L.Rev. 1069, 1075-1086; Jones, *supra,* 62 Yale L.J. 515, 534-538; and Smit, *supra,* 61 Colum.L.Rev. 1031, 1040-1043), it does not necessarily follow that other methods may not be used if effective proof of delivery can be made. The provisions of article 5 provide that "unless [it] is incompatible with the law of the State addressed . . . the document may always be served by delivery to an addressee who accepts it voluntarily." The return receipt is some evidence of this fact.

The provisions of subdivision (i) of rule 4 of the Federal Rules of Procedure (see fn. 4 above) were promulgated January 21, 1963 to be effective July 1, 1963. (374 U.S. 865; 4 Wright & Miller, Federal Practice and Procedure (1969) § 1007 at p. 62, fn. 26, and accompanying text.) At that time, under the provisions of the governing statute, the rules could not be effective until reported to Congress which then had an opportunity to act. (See 28 U.S.C.A., former § 2072, rev. 1966.) The purpose of the rule was to expedite service of process abroad. (See Advisory Committee's Notes for subd. (i) of rule 4, as published in (1969) 47 F.R.D. 73, 117-120; Kaplan, *Amendments of the Federal Rules of Civil Procedure,* 1961-1963(I) (1964) 77 Harv.L.Rev. 601, 635-637; and Comment (1964) 62 Mich.L.Rev. 1375, 1377-1382.) If petitioner's interpretation of the treaty is accepted it means that the Senate in ratifying the treaty April 14, 1967, intended to abrogate what it had impliedly approved four years earlier.

It is more reasonable to infer that in approving subdivision (a) of article 10 the Senate intended to retain service by mail, as provided in subdivision (i) of rule 4, as an effective method of service of process in a foreign country unless that country objected to those provisions. Moreover, if the treaty abrogated the provisions of subdivision (i) of rule 4 which permits service of process abroad by mail when there is proof of delivery, it is strange that there has been no change in the provisions of that subdivision despite other revisions of the rules which have been made since February 10, 1969, when the treaty became effective.

Finally it may be noted that it does not appear that service by mail with evidence of delivery is not "a method prescribed by the internal law of [Japan] for the service of documents in domestic actions upon persons who are within its territory. . . ." (Art. 15, subd. (a).) From all that appears in the record the internal law of Japan permits transmission by postal channels of documents coming from abroad for service within its territory.[5] The failure to object to the provisions of subdivision (a) of article 10 may be so construed.

Therefore, it is concluded that the provisions of the convention do not prevent the exercise of jurisdiction of the courts of this state in actions where the court has jurisdiction over a party arising from the nature of the claim asserted and notice has been given by service by mail accompanied by a receipt for delivery. It is recognized that this court cannot render an interpretation of the treaty which will bind the courts of Japan in the event plaintiff, if he obtains a judgment against petitioner, seeks to enforce it through the courts in that nation. Nevertheless, an interpretation must be made at this time, and the conclusion of this court is consistent with both the letter and the spirit of the convention.

### III

In *Julen v. Larson* (1972) 25 Cal.App.3d 325 [101 Cal.Rptr. 796], this state refused to enforce a default judgment taken in a Swiss court against a local defendant, who presumably had been doing business in Switzerland, because the documents forwarded to him by certified mail by the local Swiss consul were entirely written in the German language and were not described in the forwarding letter. The court concluded: "Since in the present case no informative notice was given in English, we

---

[5]Article 19 of the convention reads: "To the extent that the internal law of a contracting State permits methods of transmission, other than those provided for in the preceding articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions."

conclude that the documents and correspondence served on defendant did not give him sufficient notice of the pending Swiss action and consequently the Swiss court never acquired the basis on which to adjudicate the claim of personal jurisdiction over defendant." (25 Cal.App.3d at p. 330. See also *People* v. *Harlow* (1935) 9 Cal.App.2d 643, 645 [50 P.2d 1052].)

Petitioner urges that the service of process should be quashed because the documents transmitted by mail were not written in the Japanese language. Significantly in *Julen* v. *Larson,* the court recognized the convention heretofore reviewed. (See part II above.) It noted the provisions of the convention which provide for use of the English or French language.[6]

Admittedly in this case service was not made through a Central Authority designated by the receiving state under the convention, but by means of an alternative method. Plaintiff, therefore, cannot rely upon the authorization of English language contained in the treaty, although it may be persuasive on the issue of whether the recipient legally did have actual notice. The record does show by the declaration of a qualified international lawyer that in his experience "all Japanese companies involved in trade with other countries carry on correspondence with enterprises in such other countries relating to such trade in the English language, and almost all Japanese companies involved in trade with other countries are accustomed to receiving communications in English and have facilities for the interpretation and translation of the same." The record does show that the recipient executed the postal receipt which was written in English

---

[6]Article 5 provides in part: ". . . If the document is to be served under the first paragraph above [by the "Central Authority" itself or "an appropriate agency" with whom it made the arrangements], the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed. [¶] That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document."

Attached to the convention are forms for request for service, certificate of service and a summary of the document to be served. Article 7 provides: "The standard terms in the model annexed to the present Convention shall in all cases be written either in French or in English. They may also be written in the official language, or in one of the official languages, of the State in which the documents originate. [¶] The corresponding blanks which shall be completed either in the language of the State addressed or in French or in English." (See *Julen* v. *Larson, supra,* 25 Cal.App.3d at p. 329.)

Parenthetically it was noted in *Julen* v. *Larson,* "[a]lthough service of process by mail in a foreign country is no longer automatically objectionable and in appropriate instances may result in the acquisition by a foreign court of personal jurisdiction over a defendant (cf. Code Civ. Proc., §§ 413.10, 415.40, 417.20), the process served must give defendant sufficient notice of the pending foreign proceedings to satisfy the requirements of due process of law." (*Id.* at pp. 327-328.)

and French. Petitioner also apparently authorized the use of brochures printed in English to further sales of its products in this state. The special appearance in these proceedings bespeaks that the purport of the documents was understood. Under these circumstances there was neither a lack of due process of law nor a violation of the letter or spirit of the treaty.

The alternative writ is discharged. The petition for peremptory writ of mandate is denied.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied August 28, 1973, and petitioner's application for a hearing by the Supreme Court was denied October 3, 1973.