[No. B085703. Second Dist., Div. Four. July 2, 1996.]

KENNETH L. BALCOM, Plaintiff and Respondent, v.
DAWN HILLER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts A., C., and D., of the Discussion.

## Counsel

Dawn Hiller, in pro. per., for Defendant and Appellant.

Zoya K. Shenker for Plaintiff and Respondent.

## Opinion

**VOGEL (C. S.), P. J.—**

### Introduction

In November 1992, Kenneth L. Balcom (Balcom) sued Dawn Hiller (Hiller) based upon his claim that she appropriated $100,000 belonging to him. After Balcom had Hiller personally served in England, Balcom had a default entered against her in March 1993 and, after later conducting a prove-up hearing, had a default judgment entered against her in July 1993. In April 1994, Hiller moved to vacate the default and default judgment and to dismiss based upon lack of personal jurisdiction and failure to comply with the rules of the Hague Service Convention. The trial court denied her motion in its entirety. This propria persona appeal by Hiller follows. We affirm.

### Factual and Procedural Background

On November 12, 1992, Balcom filed his verified complaint, supported by several exhibits, against Hiller and Barclay's Bank PLC (Barclay's). Balcom

alleged that in November 1988, he entered into an oral agreement with Hiller that she would act as his agent in investing his funds in stocks and commodities and receive one-half the profits generated. Balcom executed a limited power of attorney to give her access to his accounts. In June 1991, Balcom discharged Hiller. In August 1991, Hiller, without Balcom's knowledge or consent, engaged in transfers of Balcom's money, ultimately resulting in the deposit of $100,000 of his funds into an account at a branch of Barclay's located in England. Based upon these allegations, Balcom alleged causes of action against Hiller for conversion and breach of fiduciary duty and against Barclay's for "money held by bank."

On March 16, 1993, Balcom dismissed Barclay's from the action without prejudice pursuant to the following agreement. Barclay's agreed that it would "not release the funds it now holds in England without a final order from a court with personal jurisdiction over Hiller and Balcom that is binding upon Balcom and Hiller [and] that in the event Balcom obtains a default judgment against Hiller and registers and enforces that judgment in England so as to bind Hiller, Barclays will honor that judgment."

In March 1993, Balcom filed a request for entry of default against Hiller. The request was supported by a declaration executed under penalty of perjury by Martin Francis Worsdall averring that he (Worsdall) had *personally* served Hiller on January 25, 1993, with summons and verified complaint in England. Worsdall specified the address at which service was effectuated. The request for default included a declaration that a copy thereof had been mailed to Hiller at the same address in England. The court duly entered the default on March 25, 1993.

On July 23, 1993, the trial court conducted a hearing on Balcom's motion to enter a default judgment. Balcom introduced a detailed six-page declaration, supported by six documentary exhibits, explaining the pertinent events.[1] The court entered judgment in Balcom's favor. The judgment recites, in pertinent part: "[I]t appearing that defendant, Dawn Hiller, aka Dawn Hillier, having been regularly served with process, having failed to appear and answer the Plaintiff's [complaint] file[d] on November 12, 1992, and the default of said defendant having been duly entered on March 25, 1993, and evidence having been considered by the Court: [¶] It is hereby ordered, adjudged and decreed: That Plaintiff, Kenneth L. Balcom recover from the Defendant, Dawn Hiller, aka Dawn Hillier, [¶]1. The entire proceeds of the Barclay's Bank, PLC account number 90143391 in the present names of Kenneth L. Balcom, aka Ken Balcom and Dawn Hiller, aka Dawn

---

[1]Hiller did not include this declaration in her appellant's appendix. Balcom brought it to our attention through submission of his respondent's appendix.

Hillier, which constituted the specific funds converted by the Defendant, Dawn Hiller, aka Dawn Hillier, from the Plaintiff; [¶]2. The sum of $100,000.00 plus prejudgment interest thereon at the rate of 10% per annum from August 23, 1991 in the amount of $15,012.37 totalling the sum of $115,012.37. Any monies recovered from the Barclay's Bank account described in number 1 above, shall be credited against this award of $115,012.37. [¶]3. For punitive damages in the amount of $0. [¶]4. For Plaintiff's costs of suit incurred herein in the amount of $232.00."

On January 24, 1994, Hiller, in propria persona, filed an ex parte application for order to vacate and set aside default and default judgment and to quash service of summons and dismiss action. The court's minute order states: "The court declines to rule on the ex parte application. In the alternative, the Court indicates that the matters must be scheduled as a noticed motion."

On April 8, 1994, Hiller, in propria persona, filed a formal motion to set aside the default and default judgment, to quash service of summons, and to dismiss the action. The motion was supported by Hiller's declaration. The declaration, a prolix rambling 18-page document, alleges duplicity and deceit by Balcom and various other individuals. Its most significant allegation is Hiller's denial that Worsdall served her with summons and complaint although Hiller does indicate that she resided at the address at which Worsdall averred he had served her. As to the defalcation, Hiller alleges she legitimately ordered the transfer of funds from a joint account. As to her knowledge of Balcom's lawsuit and her responses, Hiller conceded that she first learned from a third party in December 1992 that Balcom had sued her; that in March 1993 she sent a fax to the Los Angeles Superior Court to "alert" it that Balcom was attempting to commit a fraud on the court; that she did receive by mail a copy of Balcom's March 1993 request to enter default; that she thereafter sent declarations to the clerk of the superior court denying she had ever been served in the case; that in September 1993 she learned that the default judgment had been entered against her when Balcom brought it to England in an attempt to enforce it; that she thereafter returned to California and engaged in unsuccessful settlement negotiations with Balcom in November and December of 1993; and that she had been unable to file the present motion until April 1994 due to the January 1994 Northridge earthquake, her poor health, and her inability to obtain counsel to represent her.

Hiller also contended that Balcom's service upon her as well as the entry of judgment did not conform to the rules of the Hague Service Convention and that the trial court lacked personal jurisdiction over her.

Balcom's opposition to Hiller's motion pointed out that Hiller had left California for England in September 1991, shortly after the alleged defalcation; contested Hiller's claim that she had not been personally served in England; and urged that Hiller had not acted with reasonable diligence given the concession in her declaration that she had learned of the entry of the default judgment in September 1993 but did not file her motion until April 1994.

Following a hearing at which both sides presented argument, the court denied Hiller's motion because it was untimely. Noting that Hiller conceded she had returned to California in November 1993, the court found she had had "ample opportunity since [then] to move within the six-month period in a way that did comply with the rules."

After Hiller filed a notice of appeal from the trial court's ruling, she moved to prepare a settled statement on appeal in lieu of a reporter's transcript of the April 28, 1994, proceedings. The court ultimately denied the motion because Hiller had failed to make the requisite showing that she was " 'without adequate funds to order and pay for a reporter's transcript.' " (Cal. Rules of Court, rule 7(a).) Meanwhile, it was discovered that the superior court file was missing. Hiller moved to prepare a settled statement of the contents of the lost file. The motion was heard and denied by the same judge who had denied Hiller's earlier motion to vacate the default judgment. Each party has provided an appendix on appeal in lieu of clerk's transcript. Balcom's appendix includes a reporter's transcript of the hearing in which the trial court denied Hiller's *second* motion for a settled statement. Because the court's ruling sheds some light on the issues raised on this appeal, we set it forth, in toto.

"The court's clerk has just advised me that we received a written communication from the defendant [Hiller] indicating that she would not be here and that she would be out of town somewhere. . . . I've reviewed her motion, and there are certain things that I'd like to put on the record to make my ruling and my reasons for the ruling that more clear. When she originally brought the motion [to vacate the judgment], she brought it outside the six-month period, but as I recall, claimed that the six-month period had been extended, A, by the January 1994 earthquake, and, B, by the fact that the last day fell on a holiday. *The court*, after reviewing the fact that the defendant had been in this country by her own admission stated on the record since the prior November in 1993 and her acute awareness of when the six-month statute ran, *found that the choice of waiting for the expiration of the six-month statute did not constitute a mistake, inadvertence, surprise or excusable neglect. In fact, I believe she was misusing the processes of this court. Despite*

*the fact that she appeared in pro per, the sophistication of her pleadings is such that it indicates either she's extremely well informed as to the state of American law or she's being very well advised by a shadow attorney, and that I think she was acutely aware of all of her rights, privileges, et cetera, at that time.* If she were to have appeared this morning, I would have cautioned her concerning the provisions of CCP 128.7, which hold in pertinent part that she may not misuse the processes of this court to meet her own ends, and by her signing of the pleadings, will hold herself liable for sanction or misusing this court's time. She has manipulated her apparent English nationality and long-term residence in this country to her own ends including, it appears, *being the last person who had custody of this court's file which has since disappeared, and it seems to me that the appropriate finding is that she is responsible for that disappearance, and I will make this finding at this point.* Therefore, I will deny her motion for an order to settle the statement for several reasons. One, I do not believe that she has yet met the requirements of the Rules of Court or the Code of Civil Procedure in several respects. One, that she has not shown adequate evidence that she is truly without funds. B, I think that her assertions that she is not subject to the jurisdiction of this court is a blatant misrepresentation of her resident status that went before. . . ." (Italics added.)

## Discussion

On this appeal, Hiller, representing herself, advances several contentions in an effort to secure a reversal, none of which has merit.

A. *The Trial Court Properly Exercised Personal Jurisdiction Over Hiller**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Balcom Complied With the Requirements of the Hague Service Convention*

■ Because Hiller was in England at the time of service of process, Balcom was required to serve her pursuant to the specifications of the Hague Service Convention (Convention). (See, in general, *Volkswagenwerk Aktiengesellschaft* v. *Schlunk* (1988) 486 U.S. 694, 699 [100 L.Ed.2d 722, 730-731, 108 S.Ct. 2104]; *Shoei Kako Co.* v. *Superior Court* (1973) 33 Cal.App.3d 808, 812-822 [109 Cal.Rptr. 402], and Code Civ. Proc., § 413.10, subd. (c).) Failure to comply with the Convention renders the service void, even if the defendant has actual notice of the lawsuit. (See, e.g., *Honda Motor Co.* v. *Superior Court* (1992) 10 Cal.App.4th 1043, 1049 [12

*See footnote, *ante*, page 1758.

Cal.Rptr.2d 861], and *Dr. Ing H.C. F. Porsche A.G.* v. *Superior Court* (1981) 123 Cal.App.3d 755, 762 [177 Cal.Rptr. 155].)

Article 1 of the Convention states that it "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." (See Appen. to Fed. Rules Civ. Proc., rule 4, 28 U.S.C.)

Articles 2 through 6 of the Convention establish a system whereby each participating country will organize and designate a "Central Authority" to receive, and to reject or to execute, and to certify requests for service of process from parties in other participating states. Both the United States of America and the United Kingdom are participating countries. Balcom concedes that he did not have Hiller served through the designated Central Authority in the United Kingdom. That, however, is not the end of the inquiry because the Convention recognizes other methods of service.

Article 10 of the Convention states: "Provided the State of destination does not object, the present Convention shall not interfere with . . . (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination." This provision contemplates the use of process servers. (Practical Handbook on the Operation of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (1992) Hague Conference on private international law, pp. 45-46; see also *Tamari* v. *Bache & Co. (Lebanon) S. A. L.* (N.D. Ill. 1977) 431 F.Supp. 1226, 1229.)

Hiller claims the United Kingdom objected to article 10, paragraph (c) of the Convention. She relies upon the declaration in which the United Kingdom resolved: "With reference to the provisions of paragraphs (b) and (c) of Article 10 of the Convention, *documents for service through official channels* will be accepted in the United Kingdom only by the central or additional authorities and only from judicial, consular or diplomatic officers of other Contracting States." (Italics added; see Appen. to Fed. Rules Civ. Proc., rule 4, 28 U.S.C.) Hiller urges that this resolution means that in the United Kingdom, service pursuant to article 10 paragraph (c) is valid only if routed through judicial, consular or diplomatic officers to the central authorities. This identical argument was made and rejected in *Tax Lease Underwriters* v. *Blackwell Green, Ltd.* (E.D.Mo. 1985) 106 F.R.D. 595. There, a solicitor *personally* served the defendant in England. The defendant urged the service did not comply with the Convention because it was not routed through the official authorities designated by the United Kingdom. The court held:

"[T]he summons and complaint served on [the defendant] did not constitute 'documents for service through official channels,' as that phrase was used in the United Kingdom's objections to paragraphs (b) and (c) of Article 10. *The 'service through official channels' declaration does not preclude direct service . . . .* The 'service through official channels' declaration was intended to apply to documents from an embassy or consular official. Because the service on [the defendant] complied with paragraphs (b) and (c) of Article 10 of the Hague Convention, [this argument] in support of [the] motion to quash must be rejected." (*Id.* at pp. 596-597, italics added.)

We agree with the federal court's analysis that the United Kingdom's declaration merely identifies the individuals to be used if a person wishes to serve documents through *official* channels; it does not address service through "other competent persons of the State of destination." Consequently, we conclude that a party can comply with the Convention by serving another in the United Kingdom if service is effectuated by a competent person. (Accord, *Service of Process Abroad: A Nuts and Bolt Guide* (1988) 122 F.R.D. 63, 80.)

We therefore turn to the issue of whether this case comes within the ambit of paragraph (c) of article 10 of the Convention. Clearly, Balcom was a "person interested in a judicial proceeding." Did he effect service through a "competent person[] of the State of destination"? We believe he did because we construe the phrase "other competent persons of the State of destination" to include those individuals who serve process in a manner authorized by the domestic law of the United Kingdom. Pursuant to Balcom's request, we have taken judicial notice (Evid. Code, §§ 452, subd. (f), and 459, subd. (a)) of section 65/1/2 of Order 65 of the Supreme Court Practice which provides that in the United Kingdom an originating summons must be personally served and section 65/2 of Order 65 which provides that personal service is effected if the process server leaves a copy of the document with the person to be served. According to Worsdall's declaration, that is the manner in which he served Hiller. Hiller was therefore served by a "competent person[] of the State of destination."

In sum, Balcom complied with the provisions of the Convention.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1758.

## DISPOSITION

The order appealed from is affirmed.

Epstein, J., and Baron, J., concurred.

A petition for a rehearing was denied July 22, 1996, and appellant's petition for review by the Supreme Court was denied September 18, 1996.